GARMAN TURNER GORDON LLP
GREGORY E. GARMAN, ESQ., NV Bar No. 6654
E-mail: ggarman@gtg.legal
GERALD M. GORDON, ESQ., NV Bar No. 0229
E-mail: ggordon@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ., NV Bar No. 9040
E-mail: tgray@gtg.legal
650 White Drive, Suite 100
Las Vegas, Nevada 89119
Telephone (725) 777-3000; Facsimile (725) 777-3112
*[Proposed] Attorneys for Debtor*

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>TURNBERRY/MGM GRAND TOWERS, LLC,<br><br>☒ Affects this Debtor. | Case No.: 15-13706-abl<br>Chapter 11<br><br>**JOINTLY ADMINISTERED UNDER CASE NO.: 15-13706-abl** |
| In re :<br><br>TURNBERRY/MGM GRAND TOWER B, LLC,<br><br>☒ Affects this Debtor. | Case No.: 15-13708-abl<br>Chapter 11 |
| In re :<br><br>TURNBERRY/MGM GRAND TOWER C, LLC<br>☒ Affects this Debtor. | Case No.: 15-13709-abl<br>Chapter 11<br><br>Date: August 31, 2015<br>Time: 9:30 a.m. |

**DEBTORS' MOTION FOR AN ORDER: (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) APPROVING LOAN DOCUMENTS RELATING TO THE FOREGOING, (IV) GRANTING RELIEF FROM THE AUTOMATIC STAY, AND (V) GRANTING OTHER RELATED RELIEF**

Turnberry/MGM Grand Towers, LLC (the "Tower A Debtor"), a Nevada limited liability company, Turnberry/MGM Grand Tower B, LLC (the "Tower B Debtor"), a Nevada limited liability company, and Turnberry/MGM Grand Tower C, LLC (the "Tower C Debtor," and collectively, the "Debtors" or "Borrowers," and each a "Borrower"), a Nevada limited liability company, debtors and debtors-in-possession, hereby submit their *Motion for an Order: (I) Authorizing Post-Petition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Approving Loan Documents Relating to the Foregoing, (IV)*

*Granting Relief from the Automatic Stay, and (V) Granting Other Related Relief* (the "Motion"). This Motion is made and based upon the memorandum of points and authorities provided herein, the declaration of Dr. Kenneth W. Wiles filed concurrently herewith (the "Wiles Decl."), the papers and pleadings on file herein, judicial notice of which is respectfully requested, and any argument of counsel entertained by the Court at the time of the hearing of the Motion.

## I. INTRODUCTION

1.  On June 26, 2015 (the "Petition Date"), the Debtors filed their respective voluntary petitions for relief under Chapter[1] 11 of the Bankruptcy Code, thereby commencing the above-captioned cases (the "Chapter 11 Cases"). See ECF No. 1.

2.  On July 2, 2015, the Court approved the joint administration of the Chapter 11 Cases under Case Number 15-13706-abl. See ECF No. 29.

3.  The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108, and no request has been made for the appointment of a trustee or examiner and no official committees have been appointed in these Chapter 11 Cases.

4.  Pursuant to LR 9014.2, the Debtors consent to entry of final order(s) or judgment(s) by the bankruptcy judge if it is determined that the bankruptcy judge, absent consent of the parties, cannot enter final orders for judgment consistent with Article III of the United States Constitution absent consent.

## II. JURISDICTION AND VENUE

5.  This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1134. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). The statutory basis for the relief sought herein arises from Sections 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3) and 364(e), Bankruptcy Rules 2002, 4001, 6004, and 9014, and LR 4001. Venue of the Debtors' Chapter 11 Cases in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] Unless otherwise stated, all references to "Sections" herein shall be to the Bankruptcy Code appearing in Title 11 of the U.S. Code; all references to a "Bankruptcy Rule" shall refer to the Federal Rules of Bankruptcy Procedure; and all references to a "Local Rule" shall refer to the Local Rules of Bankruptcy Practice of the U.S. District Court for the District of Nevada.

2

### III. RELIEF REQUESTED

6. The Debtors seek entry of an order (the "Final Order"): (i) authorizing post-petition financing; (ii) granting liens and providing superpriority administrative expense priority pursuant to Sections 364(c)(1), 364(c)(2), and 364(c)(3); (iii) approving the Loan Documents (as defined below); (iv) granting relief from the automatic stay pursuant to Section 362; and (v) granting other related relief. A proposed form of order is attached hereto as **Exhibit "2"** (the "Final Order").

7. The post-petition financing is a loan in the principal amount not to exceed Two Million and No/100 Dollars ($2,000,000.00) (the "DIP Loan") pursuant to: (i) that certain *Debtor-in-Possession Loan Agreement* (the "DIP Loan Agreement")[2] attached hereto as **Exhibit "1,"** between the Debtors, as borrowers, and The Signature Condominiums, LLC, a Nevada limited liability company (together with its successors and permitted assigns pursuant to the terms of the DIP Loan Agreement, the "MGM Lender") and an entity to be designated by Turnberry (as defined below) (the "Turnberry Lender," and together with the MGM Lender, the "DIP Lenders") and an entity to be designated by Turnberry (as defined below) as Administrative Agent under the DIP Loan Agreement (the "Administrative Agent"); (ii) the Final Order; and (iii) all other security agreements, pledge agreements, promissory notes, and any other related loan documents (collectively, as may be amended, modified, or supplemented, the "Loan Documents").

### IV. STATEMENT UNDER BANKRUPTCY RULE 4001 AND LR 4001

8. Pursuant to Bankruptcy Rule 4001(c), below is a summary of the material terms of the proposed DIP Loan (together with reference to applicable sections of the DIP Loan Agreement and/or the Final Order:

*(a) Total Dollar Commitment.* $2 Million. See DIP Loan Agreement, at Sch. II.

*(b) Interest Rate.* A non-default rate of five percent (5.0%) per annum and a default rate of seven percent (7.0%) per annum. Except as otherwise set forth in the DIP Loan Agreement, accrued and outstanding interest will be due and payable on the Maturity

---

[2] All capitalized, undefined terms herein shall have the meanings ascribed to them in the DIP Agreement.

Date. See id. §§ 1 and 2(b).

*(c)* **DIP Lenders' Fees and Expenses.** The DIP Lenders and the Administrative Agent will bear their own fees and costs arising from and in connection with the DIP Facility absent an Event of Default under the DIP Credit Agreement. In the Event of Default, fees and costs are assessed as a result of the Event of Default. See id. § 1 (definition of "Obligations").

*(d)* **Maturity.** The earliest of (i) June 30, 2016, (ii) the date of acceleration of any of the Obligations pursuant to Section 8 of the DIP Loan Agreement, or (iii) the effective date of a plan of reorganization or plan of liquidation with respect to any Borrower. See id. § 1 (definition of "Maturity Date").

*(e)* **Events of Default**. As more fully set forth in Section 7 of the DIP Loan Agreement, the following are Events of Default, certain of which are subject to cure periods: (i) failure of the Borrowers to make any payment of principal of or interest upon the Loans when due and payable; (ii) failure of any Borrower to make any payment of principal of or interest upon the Loans when due and payable or perform or observe any term, covenant, or agreement contained in the DIP Loan Agreement, any other Loan Document, or Final Order (upon, where applicable, the expiration of the cure period); (iii) any representation, warranty, or certification by any Borrower made herein, in the Loan Documents, or in any other document or instrument furnished in connection with the DIP Loan Agreement proves to have been incorrect or misleading in any material respect on or as of the date made or deemed made; (iv) any Borrower fails to receive, as and when required, any consent or approval from any Governmental Authority necessary in order for such Borrower to perform its obligations under the DIP Loan Agreement in accordance with all applicable laws, rules, and regulations;  (v) Andare Corp, acting through its principal, Dr. Kenneth W. Wiles, ceases to serve as the Independent Manager of any Borrower pursuant to its organizational documents unless the resignation or removal of the Independent Manager (and/or replacement of Dr. Wiles) and the selection of its and/or his successor is made in accordance with organizational documents of the applicable Borrower and is approved in advance by Required Lenders; (vi) the filing by any of the Debtors of any motion or proceeding or the entry of an order by the Bankruptcy Court, which could reasonably be expected to result in material impairment of the Administrative Agent's or any Lender's rights under the Loan Documents or the Final Order; (vii) the occurrence of any of the following in any Chapter 11 Cases:

(A) the Final Order shall not have been entered within forty-five (45) days of the execution of the DIP Loan Agreement or at any time ceases to be in full force and effect;

(B) the entry of an order amending, supplementing, staying, vacating, reversing, or otherwise modifying the DIP Loan Agreement, the other Loan Documents, or the Final Order without the written consent of the Required Lenders (other than the replacement of the Final Order);

(C) the appointment in any of the Chapter 11 Cases of an interim or permanent

trustee or the appointment of a responsible person or an examiner with expanded powers to operate or manage the financial affairs, the business, or reorganization of any Borrower (powers beyond those expressly set forth in Section 1106(a)(3) and (4));

(D) the dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases from one under Chapter 11 to one under Chapter 7;

(E) the entry of an order by the Bankruptcy Court granting relief from or modifying the automatic stay of Section 362 to allow any creditor to execute upon or enforce a Lien on any Collateral or to permit the perfection of any Lien on the Collateral unless such Lien is or shall be junior in priority to the Liens securing the Obligations;

(F) the entry of an order avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under the DIP Loan Agreement;

(G) the entry of an order granting any super-priority administrative claim (other than the Carve-Out) or Lien (including adequate protection Liens) which are equal or superior to that provided to the DIP Lenders;

(H) the filing of any pleading by any Borrower seeking or otherwise consenting to or supporting any of the matters set forth in clauses (iii), (iv), (v), (vi), or (vii) of Section 7(i) of the DIP Loan Agreement;

(I) the filing of any plan of reorganization or a plan of liquidation without the prior written consent of the Required Lenders or the termination or lapse of any Borrower's "exclusive period" under Section 1121 for the filing of a plan of reorganization without the prior written consent of the Required Lenders;

(J) the grant of any adequate protection rights to any holder of a pre-petition claim or interest, unless otherwise consented to by the Required Lenders;

(K) any Borrower (i) engages in or supports any challenge to the validity, perfection, priority, extent, or enforceability of the DIP Loan Agreement or any other Loan Document or the Liens on or security interests in the assets of the Borrowers securing the Obligations; or (ii) commences any actions or proceedings against the Administrative Agent or any DIP Lender or any of the Affiliated Entities; *provided, however*, that it shall not constitute an Event of Default if any of the Borrowers conduct an investigation of or informally assert any claims or causes of action against any of the Affiliated Entities with respect to matters other than those set forth in clause (i) above so long as the costs and expenses associated with such investigation are consistent with the Authorized Budget and the DIP Loan Agreement;

(L) the allowance of any claim or claims under Section 506(c) or 552(b) against or with respect to any of the Collateral;

5

(M) any creditors' committee commences any actions or proceedings against any of the Affiliated Entities hereto; *provided, however,* it shall not constitute an Event of Default if the creditors' committee in conjunction with the Borrowers conducts an investigation of or informally asserts any claims or causes of action against any of the Affiliated Entities so long as the costs and expenses associated with such investigation are consistent with the Authorized Budget and the DIP Loan Agreement;

(N) the failure of the Borrowers to submit to the DIP Lenders for their consent a detailed proposed draft of the Claims Resolution Protocol[3] no later than the date that is fifteen (15) days after the Bar Date or such later date as determined by the Required Lenders in their sole and absolute discretion;

(O) the failure of (i) the Borrowers to file a motion with the Bankruptcy Court seeking authority to implement the Claims Resolution Protocol, which Claims Resolution Protocol and associated motion, shall be in form and substance acceptable to the Required Lenders, no later than the date that is thirty (30) days after the Bar Date or such later date as determined by the Required Lenders in their sole and absolute discretion, or (ii) the Bankruptcy Court to enter an order authorizing the Borrowers to implement the Claims Resolution Protocol, in form and substance reasonably acceptable to the Required Lenders, no later than the date that is sixty (60) days after the date the Borrowers move for such relief or such later date as determined by the Required Lenders in their sole and absolute discretion;

(P) the failure of the Borrowers to satisfy any deadlines or other obligations set forth in the Claims Resolution Protocol approved by the Bankruptcy Court;

(Q) any Borrower moves the Bankruptcy Court to enter, modify, or amend the order authorizing the Claims Resolution Protocol or the Claims Resolution Protocol itself without such order or Claims Resolution Protocol being in form and substance reasonably acceptable to the Required Lenders;

(R) the entry by the Bankruptcy Court of an order authorizing a Claims Resolution Protocol that is not in form and substance reasonably acceptable to the Required Lenders or modifying or amending any such order or the Claims Resolution Protocol in a manner that is not in form and substance reasonably acceptable to the Required Lenders;

(S) any Borrower moves the Bankruptcy Court to enter, modify, or amend the Final Order without the prior written consent of the Required Lenders to the form and substance of the proposed order;

---

[3] The "Claims Resolution Protocol" means a claims resolution protocol in form and substance acceptable to, and containing detail and specificity satisfactory to, the Required Lenders setting forth (a) the Borrowers' desired mechanisms for resolving all proofs of claim and related litigation in a timely manner, and (b) proposing a budget to implement the protocol if any Loans or Cash Collateral are intended to be utilized to fund such claims resolution and such amounts are not already subject to Authorized Budget.

6

(T) the entry by the Bankruptcy Court of a debtor-in-possession financing order or amendment thereto, the form and substance of which is not consented to by each of the Required Lenders;

(U) any Borrower makes any payment of principal or interest on any pre-petition Indebtedness; or

(V) the Bankruptcy Court enters an order granting relief from the automatic stay to any Person asserting a claim or other right against any of the Borrowers relating to any alleged pre-petition actions or omissions unless otherwise consented to by the Required Lenders. See id. § 7.

*It shall not be an Event of Default under the DIP Loan Agreement if the Borrowers, or any official committee of unsecured creditors in conjunction with Debtors, conducts an investigation of or informally asserts any claims or causes of action against any of the DIP Lenders or their respective affiliates (in the case of the Debtors, with respect to matters other than the validity, perfection, priority, extent or enforceability of any Loan Documents or the DIP Liens), so long as the costs and expenses associated with such investigation are consistent with the Authorized Budget and the DIP Loan Agreement.* See id. § 7(i)(xi)

(f) **Purpose and Use of Proceeds and Cash Collateral.** The Borrowers shall utilize the proceeds of the Loans and Cash Collateral solely to fund, and in each case solely in accordance with the Authorized Budget, the DIP Loan Agreement and the Final Order: (i) the general working capital requirements of the Borrowers, including certain allowed administrative costs and expenses of the Chapter 11 Cases during the pendency of the Chapter 11 Cases (including the Borrowers' expenses with respect to the Claims Resolution Protocol consented to by the Required Lenders); (ii) the satisfaction of any interest, fees and costs arising in connection with the DIP Loan Agreement; (iii) payment of the fees, costs and expenses incurred by the Borrowers as debtors-in-possession in the Chapter 11 Cases, which fees and expenses include but are not limited to, payment of the fees and expenses of the Borrowers' professionals retained pursuant to Sections 327 and 328, approved in accordance with Sections 330 and 331, the Federal Rules of Bankruptcy Procedure, the Bankruptcy Court's Local Rules, the rules and requirements of the U.S. Trustee and any order, ruling or judgment entered by the Bankruptcy Court in the Chapter 11 Cases up to the amounts permitted in the Authorized Budget; and (iv) the costs of settlement negotiations and mediation with holders of claims against the Borrowers and any other litigation counterparts. See id. § 6(f), Recitals, and Authorized Budget attached as Exhibit A to the DIP Loan Agreement.

(g) **Grant and Scope of Liens on Property of the Estates.** As security for the DIP Obligations, the Administrative Agent, on behalf of itself and the DIP Lenders, is granted, subject only to payment of the Carve-Out,[4] valid, binding and fully

---

[4] "Carve-Out" means the payment of (a) subject to the Authorized Budget, (i) the aggregate amount of any budgeted and unpaid fees, costs and expenses allowed by an order of this Court that were accrued or incurred prior to the Maturity Date by the professionals retained in the Chapter 11 Cases by the Debtors or on behalf of their estates (collectively, the "Professionals") and (ii) the accrued and unpaid costs and expenses of the Debtors' Independent

7

perfected, security interests in, and liens upon (the "DIP Liens"), all property of the Debtors and their estates, whether existing prior to the Petition Date or acquired or arising thereafter, and whether now existing or hereafter acquired or arising, of any nature whatsoever (collectively, the "DIP Collateral"); ***provided, however, that the DIP Collateral shall <u>not</u> include: (i) avoidance actions under Sections 502(d), 544, 547, 548, 550, and 553; or (ii) any claims or causes of action against any of the Debtors' members or the Affiliated Entities, including, for the avoidance of doubt, the claims and causes of action that could give rise to Embezzlement Claim Proceeds, or any proceeds of, or recoveries related to, the foregoing avoidance actions or claims.***

*(i) **First Lien on Cash Balances and Unencumbered Property.*** Pursuant to Section 364(c)(2), the DIP Lenders shall receive a continuing, enforceable, first priority, fully-perfected lien and security interest upon all of the Debtors' right, title, and interest in, to and under all DIP Collateral that is not otherwise encumbered by a validly perfected security interest or lien on the Petition Date (collectively, the "Unencumbered Property");

*(ii) **Liens Junior to Certain Other Liens.*** Pursuant to Section 364(c)(3), the DIP Lenders shall receive a junior, perfected lien and security interest (other than as set forth in sub-paragraph (iii) below) upon all of the Debtors' right, title, and interest in, to and under all DIP Collateral (other than the property described in sub-paragraph (a) of Paragraph 12 of the DIP Loan Agreement), whether now existing or hereafter acquired, that is subject to (A) any validly perfected and enforceable security interest or lien in existence as of the Petition Date that is not subject to section 552(a), or (B) any valid and enforceable security interest or lien perfected (but not granted) after the Petition Date (to the extent such perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code) that is not subject to section 552(a) (the "Existing Liens"); and

*(iii) **Liens Senior to Certain Other Liens.*** The DIP Liens shall not be subject or subordinate to (A) any lien or security interest that is unperfected or avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (B) any lien arising after the Petition Date including, without limitation, any lien or security interest granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtors, or (C) any intercompany or affiliate lien of the Debtors. <u>See</u> Final Order § 12.

***This Motion does not propose to grant any priming liens pursuant to Section 364(d).***

---

(continued)

Manager, Andare, as of the Maturity Date, plus (b) those fees, costs and expenses incurred by the Professionals after the Maturity Date and subsequently allowed by order of this Court, together with the fees, costs and expenses incurred by Andare after the Maturity Date, in an aggregate amount not to exceed $50,000, plus (c) fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930. <u>See</u> DIP Agreement §1 (definition of "Carve-Out").

*(h)* **Borrowing Limits and Borrowing Conditions.** The conditions to the effectiveness of the Initial Loan are set forth in Section 4(a) of the DIP Loan Agreement and the conditions to the effectiveness of each Loan are set forth in Section 4(b) of the DIP Loan Agreement, which conditions include, among other things, that no Event of Default has occurred, the Cash Collateral shall be less than $250,000 and the DIP Lenders have received an Authorized Budget. See DIP Agreement §§ 4(a) and (b).

*(i)* **No Adequate Protection or Priority for a Prepetition Claim.** Debtors are unaware of any prepetition secured creditors other than as related to the letters of credit discussed below, but in any event, the claims of prepetition secured creditors are not being primed under Section 364(d) of the Bankruptcy Code. See Final Order § 12.

*(j)* **Determination of the Validity of Prepetition Liens.** This Motion and DIP Loan Agreement do not address such provisions as the DIP Lenders are not prepetition secured creditors.

*(k)* **Waiver or Modification of the Automatic Stay.** The Motion seeks modification of the automatic stay imposed under Section 362 to the extent necessary to permit Debtors, the Administrative Agent, and the DIP Lenders to perform all acts and to make, execute and deliver all instruments and documents and to pay all fees (when applicable), that may be reasonably required or necessary for the Debtors' performance of their obligations under the DIP Documents and the Final Order. See DIP Loan Agreement § 4(a)(iv); Final Order § II.3 and II.16. As more fully discussed in Section II.19 of the Final Order, the Motion also seeks modification of the automatic stay to allow the DIP Lenders to realize on the DIP Collateral and exercise, upon the occurrence and during the continuance of any Event of Default, all rights and remedies provided for in the DIP Loan Documents. See Final Order § II.19.

*(l)* **Waiver of Right Regarding Filing of Plan and/or to Request Authority to Obtain Credit from Others.** As stated above, the filing of any plan of reorganization or a plan of liquidation without the prior written consent of the Required Lenders or the termination or lapse of any Borrower's "exclusive period" under Section 1121 of the Bankruptcy Code for the filing of a plan of reorganization without the prior written consent of the Required Lenders is an Event of Default under the DIP Loan Agreement. See DIP Loan Agreement § 7(h)(i)(ix). Additionally, the Borrowers shall not create, incur, assume, or permit to exist any other financing or debt except in the ordinary course of their businesses and operations and otherwise in a manner consistent with the Authorized Budget or to create, incur, assume, or permit to exist any security interests or liens on property of the Debtors now or later own, except the Permitted Encumbrances. See id. §§ 6(g) and (h).

*(m)* **Plan-Related Deadlines.** The Loan Documents do not contain any plan-related deadlines other than as described above. See DIP Loan Agreement § 7(h)(ix).

*(n)* **Waiver Relating to Non-Bankruptcy Law.** The DIP Lenders' liens are automatically perfected without further action by the DIP Lenders or any other party. See Final Order § 12.

(o) **Release, Waiver, or Limitation on Any Claim or Other Cause of Action.**  As discussed above, it is an Event of Default if any Borrower: (i) engages in or supports any challenge to the validity, perfection, priority, extent, or enforceability of the DIP Loan Agreement or any other Loan Document or the Liens on or security interests in the assets of the Borrowers securing the Obligations; or (ii) commences any actions or proceedings against the Administrative Agent or any Lender or any of the Affiliated Entities; *provided, however,* that it shall not constitute an Event of Default if any of the Borrowers conduct an investigation of or informally assert any claims or causes of action against any of the Affiliated Entities with respect to matters other than those set forth in clause (ii) above so long as the costs and expenses associated with such investigation are consistent with the Authorized Budget and the DIP Loan Agreement.  See DIP Loan Agreement § 7(i)(xi).

(p) **Indemnification.**  The Debtors will indemnify and hold the DIP Lenders and Administrative Agent harmless from and against various losses and claims, including professional fees and expenses related to the DIP Loan and the Loan Documents.  See id. § 9.

(q) **Release, Waiver or Limitation on Rights Under Section 506(c).**  Except to the extent of the Carve-Out, the Debtors waive any right to surcharge the DIP Collateral pursuant to Section 506(c).  It shall be an Event of Default if the Debtors or any other party in interest and/or creditor shall file or commence any proceeding to surcharge the DIP Collateral.  See Final Order § 17; DIP Loan Agreement § 7(i)(xii).

(r) **Liens Granted on Claims Arising Under Chapter 5.**  The DIP Lenders' liens shall *not* attach to, and the collateral for the DIP Loan shall not include: (i) avoidance actions under Sections 502(d), 544, 547, 548, 550, and 553; or (ii) any claims or causes of action against any of the Debtors' members or the Affiliated Entities, including, for the avoidance of doubt, the claims and causes of action that could give rise to Embezzlement Claims Proceeds, or any proceeds of, or recoveries related to, the foregoing avoidance actions or claims.  See Final Order ¶ 12.

### V. BACKGROUND

A. **The Debtors' Business, Ownership, and Independent Management.**

9. The Debtors are developers of high-rise condominium towers commonly referred to as The Signature Towers.  The Signature Towers consist of three towers referred to as "Tower A," "Tower B," and "Tower C," each containing 576 units, for a total of 1,728 units.  See Wiles Decl. ¶ 4.

10. The Signature Towers' condominium units were sold to individual owners who at all times could and can use their units in any manner they chose, including, but not limited to renting out their units or residing in their units full time.  See id. ¶ 5.

11. The Debtors are each Nevada limited liability companies, created to develop the three Signature Towers. Each Debtor has two members: (i) a member affiliated with the Turnberry group of entities ("Turnberry"); and (ii) a member affiliated with MGM Resorts International ("MGM"). Each member has a 50% economic interest in such Debtor. Specifically, Turnberry/Harmon Ave. LLC and MGM Grand Condominiums, LLC are the members of the Tower A Debtor; Turnberry/Harmon Ave. B LLC and MGM Grand Condominiums II, LLC are the members of the Tower B Debtor; and Turnberry/Harmon Ave. C LLC and MGM Grand Condominiums III, LLC are the members of the Tower C Debtor. Each Debtor was formerly managed by its Turnberry-affiliated member. See id. ¶ 6.

12. Prior to and since the Petition Date, Andare Corp ("Andare"), which is solely owned by Dr. Kenneth W. Wiles,[5] has served as the independent manager for each of the

---

[5] Dr. Wiles' extensive experience and independence is discussed in detail in his declaration filed at ECF No. 23. Among other things: Dr. Wiles has held multiple positions leading businesses through all aspects of operations and restructuring, including serving as the:

- Chief Financial Officer and Vice President of Business Development at SOMAR, Inc./TeleSpectrum Worldwide Inc., one of the nation's largest independent providers of outsourced teleservices including customer retention, lead generation, and customer support. Customers included NationsBank, First Union, JC Penney, American Express, Exxon, and American Bankers Insurance Group, among others.

- Managing Director at Consolidated Capital, Inc., a venture capital and financial advisory firm focused on early-stage companies.

- Vice President of Lloyd & Company, which specialized in providing middle-market and emerging growth companies with investment banking and strategic financial advisory services.

- Chief Financial Officer and Senior Vice President of Operations and Business Development at AppForge, Inc., a leader in mobile application development platforms. The Company's premier product, Crossfire, enabled Microsoft Visual Studio developers to create mobile applications one time that could run on more than 600 mobile device and operating system combinations. Crossfire was sold to Oracle Corporation (NASDAQ: ORCL) in April 2007.

- Managing Director of the Acceleron Group, LLC, a firm specializing in providing domestic and international companies with investment banking, private equity, and strategic financial advisory services. Clients included early-stage companies to multi-national financial institutions.

- Managing Partner of the Fulcrum Financial Group, a fixed income and general financial advisory firm.

- Co-Chief Executive Officer, Chief Technology Officer, and Board Member of AlertID, Inc., a neighborhood safety network with nearly 2 million members across the country and more than 350 million safety alerts sent.

In 2015, Dr. Wiles served as a consultant reporting to the chief executive officer of a retail, oil services, and gaming company with over $400 million in annual revenue to lead the operational and financial restructuring of the company.

As a result of his significant experience in business and finance and demonstrated independence,

11

Debtors. Andare is a corporate financial advisory, valuation, restructuring, expert witness and consulting firm. The firm engages with senior management teams and boards of directors to drive operational improvements and apply new working methods to underperforming or distressed companies. See id. ¶ 7.

13. Andare, of which Dr. Wiles is the sole owner, has broad managerial powers and independent control over the Debtors. In fact, none of the Debtors' respective members has authority to replace Andare as the Debtors' manager except upon: (i) the death, incapacity, or resignation of Dr. Kenneth W. Wiles from Andare; (ii) Andare's resignation as Debtors' manager; or (iii) for cause based on the gross negligence, willful misconduct, or breach of any obligation of Andare under its Engagement Letter as determined by a final, non-appealable order of a court of competent jurisdiction. See id. ¶ 8.

**B.    Litigation Ensued After the Great Recession.**

14. At the time of the initial sale of units within The Signature Towers (approximately 2004-2006), the Las Vegas real estate market was extremely active, with significant increases in real estate prices being realized on an annual (and in many cases, monthly or quarterly) basis. See id. ¶ 9.

15. Shortly after the completion of the third Signature Tower, the "Great Recession" struck, pummeling Las Vegas's economy and devastating its real estate market. The Debtors were among its many victims. See id. ¶ 10.

16. After prices of Las Vegas real estate declined dramatically, with condominium units being particularly hard hit, and hotel occupancy rates plummeting in what has been one of the worst economic declines in the past century, a number of The Signature Tower purchasers filed suit seeking to rescind their real estate contracts, alleging the condominium units were sold to them as "securities." See id. ¶ 11.

---

(continued)
in 2011, Nevada Governor, Brian D. Sandoval, appointed Dr. Wiles to The State of Nevada, Economic Forum, a panel of five economic and taxation experts that annually produce the official forecast of future state General Fund revenues. ***Dr. Wiles currently serves as the Economic Forum chairman.*** See ECF Nos. 22 and 23.

17. Since then, litigation has been pursued in Nevada's Eighth Judicial District Court, the Nevada Federal District Court, the Nevada Supreme Court, this Court, the Ninth Circuit Court of Appeals, and the United States Supreme Court. See id. ¶ 12.

**C.      The Commencement of the Chapter 11 Cases.**

18. The Debtors' ongoing operations are limited to addressing the pending litigations and arbitrations and various remaining issues from the development of The Signature Towers. See id. ¶ 13.

19. In service of those efforts, the Debtors desire to marshal the Debtors' remaining assets (described in greater detail below) and address claims raised by creditors in a manner that properly, appropriately, and fairly provides the Debtors with the ability to satisfy their creditors' legitimate and allowed claims and close the book on a project that was fully constructed and sold nearly ten years ago. See id. ¶ 14.

20. Notwithstanding the Debtors' desire to address and resolve those legitimate claims, the Debtors have remained thwarted in their efforts to do so and, after eight years and immense legal and arbitration fees and expenses, the Debtors remain at stage one, without meaningful discovery having commenced in any of the arbitrations or litigation. See id. ¶ 15.

21. Concurrently herewith, the Debtors have filed their *Motion for Entry of Administrative Procedures Order: (1) Establishing Bar Date for Filing Proofs of Claim; (2) Approving the Form and Manner for Filing Proofs of Claim; and (3) Limiting Notice of Documents Filed After the Bar Date to Those Parties Asserting Claims or Requesting Notice* (the "Bar Date Motion"), which, among other relief, seeks the establishment of claims bar dates and a modified proof of claim form in order to allow the Debtors to streamline the claims process, better identify the class in which each claimant should be placed, and clarify the basis for the asserted claims, as well as minimize the burden on claimants by eliminating the need for filing potentially voluminous documentation from the various arbitration and litigation proceedings. See ECF No. 86; Wiles Decl. ¶ 16.

. . .

13

22.     Upon receipt of the proofs of claim by October 5, 2015 (the "Proposed Bar Date"), the Debtors, in consultation with any creditors' committee that may be appointed and other applicable parties, will be poised to file the Claims Resolution Protocol setting forth the Debtors' desired mechanism for resolving all proofs of claim and related litigation in a timely manner.  See Wiles Decl. ¶ 17.

### D.     The Debtors' Assets on the Petition Date.

23.     As set forth in the Debtors' Schedules [ECF Nos. 77, 79, and 80], as of the Petition Date, the Debtors held and continue to hold several significant assets, including, among others, the following:

a.     Cash and certificates of deposit totaling $1,544,450 comprised of: (i) $877,261 held by the Tower A Debtor in its Bank of America, N.A. ("BOA") account ending in 3855 and $26,882 held by the Tower A Debtor in its BOA account ending in 7101; (ii) $572,691 held by the Tower B Debtor in its BOA account ending in 7300; and (iii) $67,616 held by the Tower C Debtor in its BOA account ending in 0390 (collectively, the "Cash").

b.     With the exception of the $26,882 held in the BOA account ending in 7101, the Cash is encumbered by the following three letters of credit issued by BOA in favor of ACE American Insurance Company ("ACE"), which insurance policies will terminate in April 2017; however, ACE periodically adjusts and reduces the required security as it determines is appropriate.  Specifically:

(i) on September 27, 2004, the Tower A Debtor caused BOA to issue a standard letter of credit, number 3065725, in the amount of $1,262,400 in favor of ACE (the "Tower A LOC").  The original expiration date was September 27, 2005, but in accordance with the terms of the Tower A LOC, the expiration date has been extended for one year intervals, with the expiration date now being September 27, 2015.  As of the Petition Date, the Tower A LOC had a balance of $869,220;

(ii) on December 1, 2005, the Tower B Debtor caused BOA to issue a standard letter of credit, number 3078832 in the amount of $568,080 in favor of ACE (the "Tower

14

B LOC"). The original expiration date of the Tower B LOC was September 27, 2006, but in accordance with the terms of the Tower B LOC, the expiration date has been extended for one year intervals, with the expiration date now being September 27, 2015. As of the Petition Date, the Tower B LOC had a balance of $568,080; and

(iii) on November 21, 2005, the Tower C Debtor caused BOA to issue a standard letter of credit, number 3065725, in the amount of $1,162,700 (the "Tower C LOC," and collectively, the "LOCs"). The original expiration date of the Tower C LOC was November 21, 2006, but in accordance with the terms of the Tower C LOC, the expiration date has been extended for one year intervals, with the expiration date now being November 21, 2015. As of the Petition Date, the Tower C LOC had a balance of $62,700. See id. ¶ 18.

c. In 2013, Hope Ippoliti, a former western regional controller for Turnberry West Realty, LLC was convicted of embezzling $5.6 Million from, among others, the Tower A Debtor. The embezzlement occurred between May 2007 and January 2012 and $1,215,527.07 of the embezzled funds were the Tower A Debtor's funds. The Tower A Debtor retains its claims with respect to the embezzlement, conversion, and fraud, as well as claims for aiding and abetting embezzlement, conversion, and fraud (the "Embezzlement Claims"). See id. ¶ 19.

d. The Debtors also retain other material litigation claims, indemnity claims, and avoidance actions. See id. The Authorized Budget consented to by the DIP Lenders provides the Debtors with funds to investigate and pursue such causes of action, including at least $50,000 to investigate any claims or causes of action (other than with respect to the validity, perfection, priority, extent, or enforceability of the DIP Loan Agreement or any other Loan Documents or the Liens on or security interests securing the Obligations) against any of the DIP Lenders or their Affiliated Entities.

24. Thus, while the Debtors have significant assets, they are presently illiquid. As a result, the Debtors require access to post-petition financing in order to fund their Chapter 11 Cases, pursuant to which they will monetize their assets, adjudicate their liabilities, and tender a

distribution to legitimate creditors through a confirmed plan of reorganization. See id. ¶ 19.

E. **The Debtors Were Unable to Obtain Alternate Financing on Terms Similar to or Better than the DIP Loan.**

25. Andare, the Debtors' independent manager, negotiated the terms of the DIP Loan at length with the DIP Lenders. As a result of these good faith, arm's length negotiations, Andare secured for the Debtors a DIP Loan on favorable terms, including the absence of any priming liens, interest due on the Maturity Date (and not monthly during the term of the DIP Loan), no obligation to pay fees or expenses of the DIP Lenders absent an Event of Default, and a sizeable budget for investigating potential claims against the DIP Lenders. See id. ¶ 20.

26. Andare has contacted several other institutional and non-institutional lenders seeking post-petition financing for the Debtors. Without unencumbered or traditional assets to serve as security or strong guarantees, Andare has been unable to obtain alternate financing on similar or better terms than provided through the DIP Loan. Not surprisingly, the institutional lenders contacted by Andare were unwilling to provide a loan without traditional collateral, such as real estate, inventory, equipment, etc., to secure the loan. See id. ¶¶ 21 and 22.

27. Similarly, non-institutional lenders contacted by Andare were unwilling to provide a loan on terms similar to or better than the DIP Loan. For instance, CFCIB and Advisors, LLC, which is in the business of providing financing for DIP loans, advised Andare that it would not be willing to provide the requested loan to the Debtors without receiving strong guarantees (something the Debtors cannot provide) and, even then, the interest rate would be above ten percent (10%) per annum (which is 5% higher than under the DIP Loan). See id. ¶ 23.

## VI. BASIS FOR RELIEF REQUESTED

A. **Debtors' Need for Financing.**

28. The Debtors' ability to pay their independent manager and retained professionals, investigate and adjudicate claims asserted against them, investigate potential avoidance actions, and otherwise finance their operations post-petition is essential to the Debtors' ability to maximize the value of their estates and identify valid creditors and other stakeholders entitled to distributions. The Debtors do not have sufficient liquid assets in their estates available to finance

16

their operation post-petition. As such, in the absence of the Debtors obtaining credit pursuant to Section 364, the Debtors' estates would suffer immediate and irreparable harm, including, without limitation, the inability to continue adjudicating claims asserted against them and monetizing their assets (including by liquidating their significant claims against third-parties) so that they can satisfy creditors' valid claims. The preservation, maintenance, and enhancement of the value of the Debtors are of the utmost significance and importance to a successful restructuring or liquidation of the Debtors. See id. ¶ 24.

29.     The Debtors need approval of and access to the DIP Loan to fund the Chapter 11 Cases. The Debtors cannot meet their ongoing post-petition obligations unless they have the authorization to execute the Loan Documents and access the proceeds of the DIP Loan. In the absence of such access to funds, immediate and irreparable harm will result to the Debtors, their estates, and their creditors, rendering a reorganization or liquidation of Debtors impossible and precluding any meaningful distribution to the Debtors' legitimate creditors. The Debtors believe that the terms and conditions of the DIP Loan Documents, and the proposed Final Order, and the related relief requested herein are fair, reasonable, and in the best interests of the Debtors, their creditors, and their estates. See id. ¶ 25.

30.     Debtors have been able to obtain financing in the aggregate maximum amount of Two Million in the form of secured credit, allowable under Section 364(b) as an administrative expense, or Section 364(c)(1) and (c)(2) as a secured expense. The source of the funding is the DIP Lenders, who own 100% of Debtors through other affiliated entities. See id.

**B.     The Debtors Do Not Have an Alternative to the DIP Loan.**

31.     While the value of the Debtors' assets exceeds $2 Million, as set forth in detail above, such assets are illiquid. Without the DIP Loan, the Debtors' ability to successfully prosecute their Chapter 11 Cases will be jeopardized. See id. ¶ 26.

32.     The Debtors believe, based on their discussions with institutional and non-institutional lenders, that they could not obtain financing from any other lender on terms equally or more favorable than the DIP Loan offered by the DIP Lenders, and certainly not before all of

the Debtors' limited cash resources were depleted by the search.  The Debtors, operating through their independent manager, Adare, exercised their best business judgment in negotiating the Loan Documents and the Final Order that is presently before the Court.  See id. ¶ 27.

33. The DIP Lenders' offer to provide the DIP Loan as an administrative claim pursuant to Section 364(b) and a non-priming secured loan pursuant to Section 364(c)(1), (c)(2), and (c)(3), in an amount necessary to meet the Debtors' working capital needs on the terms, and within the time frame provided, simply cannot, in the judgment of Debtors, be matched by any third-party lender.  See id. ¶ 28.  The DIP Lenders have already performed all the due diligence necessary in connection with the DIP Loan and, thus, are well positioned to provide post-petition financing to the Debtors.  See id. ¶ 29.

**C.    Application of the Business Judgment Standard.**

34. As described above, the Debtors have concluded that the DIP Loan provides the only reasonable alternative available under the circumstances.  Bankruptcy courts routinely defer to a debtor's business judgment on business decisions, including the decision to borrow money.  See Group of Inst'l Investors v. Chicago Mil. St. P. & Pac. Ry., 318 U.S. 523, 550 (1943); Ames, 115 B.R. at 38 (in examining requests for interim financing, courts apply the same business judgment standard applicable to other business decisions); see also In re Yellowstone Mountain Club, LLC, 2008 WL 5869859 (Bankr. D. Montana, November 26, 2008) (acknowledging the use of the business judgment standard with respect to approval of Section 364 financing).

35. Courts generally will not second-guess a debtor-in-possession's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code."  Id. at 513-14 (footnotes omitted).  See also In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).  In general, a bankruptcy court should defer to a debtor-in-possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious.  See In re Curlew Valley

Assoc., 14 B.R. 506, 511-13 (Bankr. D. Utah 1981). Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts generally grant a debtor considerable deference in acting in accordance therewith. See, e.g., In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[T]he court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estates as it is to benefit a party-in-interest.").

36. Approval of the DIP Loan will provide the Debtors with immediate and ongoing access to funds so that the Debtors can avoid harm to their estates and potential erosion of the value of their assets. Absent access to the DIP Loan, the Debtors will not have sufficient available sources of working capital and financing to successfully liquidate their assets, resolve the numerous claims asserted against them, and tender a distribution to the Debtors' legitimate creditors through a plan of reorganization. See id. ¶ 30. The funds provided under the DIP Loan will enable the Debtors to prosecute their Chapter 11 Cases in an orderly and reasonable manner that preserves and enhances the value of the estates. See id. ¶ 31.

37. The Debtors have exercised sound business judgment in determining that the proposed DIP facility is appropriate and have satisfied the legal prerequisites to borrow under the DIP Documents. Accordingly, the Debtors should be granted authority to borrow funds from the DIP Lenders pursuant to Section 364, and take the other actions contemplated herein.

D.  **Good Faith.**

38. Section 364(e) was designed to "encourage the extension of credit to debtors" by allowing lenders to "rely on a bankruptcy court's authorization of the transaction." In re EDC Holding Co., 676 F.2d 945, 947 (7th Cir. 1982) (the purpose of Section 364(e) is "to overcome people's natural reluctance to deal with a bankrupt firm whether as purchaser or lender by assuring them that so long as they are relying in good faith on a bankruptcy judge's approval of the transaction they need not worry about their priority merely because some creditor is objecting

to the transaction and is trying to get the district court or the court of appeals to reverse the bankruptcy judge"); see also In re North Atlantic Millwork Corp., 155 B.R. 271, 279 (Bankr. D. Mass. 1993) ("The purpose of section 364(e) is to allow good faith lenders to rely upon conditions at the time they extend credit and to encourage lenders to lend to bankrupt entities.").

39.    The proposed DIP Loan is the result of good faith and arm's-length negotiations, with all parties represented by counsel. Although the DIP Lenders are affiliated with the members of the Debtors, the Debtors' independent manager, Andare, negotiated the DIP Facility solely in pursuit of the best interests of the Debtors and their estates. The Debtors believe that the terms of the DIP Loan are fair and reasonable under the circumstances, and that the DIP Lenders are entitled to the benefits of Section 364(e). See id. ¶ 32.

## VII. MODIFICATION OF THE AUTOMATIC STAY

40.    The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtors to: (i) grant the liens as set forth herein and in the DIP Loan Agreement to the DIP Lenders and to perform such acts as may be requested to assure the perfection and priority of such liens; (ii) permit the DIP Lenders to exercise, in compliance with the terms of the DIP Loan Agreement, all rights and remedies under such DIP Loan Agreement; and (iii) implement the terms of the Final Order.

41.    Stay modifications of this kind are ordinary and standard features of post-petition debtor financing facilities and, in the Debtors' business judgment, are reasonable and fair under the present circumstances.

## VIII. CONCLUSION

WHEREFORE, the Debtors respectfully request entry of the Final Order attached hereto as **Exhibit "2**," granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

GARMAN TURNER GORDON

By: */s/ Talitha Gray Kozlowski*
GREGORY E. GARMAN, ESQ.
TALITHA GRAY KOZLOWSKI, ESQ.
TERESA M. PILATOWICZ, ESQ.
*[Proposed] Attorneys for Debtors*