GARMAN TURNER GORDON LLP
GREGORY E. GARMAN, ESQ., NV Bar No. 6654
E-mail: ggarman@gtg.legal
GERALD M. GORDON, ESQ., NV Bar No. 0229
E-mail: ggordon@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ., NV Bar No. 9040
E-mail: tgray@gtg.legal
650 White Drive, Suite 100
Las Vegas, Nevada 89119
Telephone (725) 777-3000; Facsimile (725) 777-3112
[Proposed] Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>TURNBERRY/MGM GRAND TOWERS, LLC,<br><br>☒ Affects this Debtor. | Case No.: 15-13706-abl<br>Chapter 11<br><br>**JOINTLY ADMINISTERED UNDER CASE NO.: 15-13706-abl** |
| In re :<br><br>TURNBERRY/MGM GRAND TOWER B, LLC,<br><br>☒ Affects this Debtor. | Case No.: 15-13708-abl<br>Chapter 11 |
| In re :<br><br>TURNBERRY/MGM GRAND TOWER C, LLC<br>☒ Affects this Debtor. | Case No.: 15-13709-abl<br>Chapter 11<br><br>Date: August 31, 2015<br>Time: 9:30 a.m. |

**DECLARATION OF DR. KENNETH WILES IN SUPPORT OF DEBTORS' MOTION FOR AN ORDER: (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) APPROVING LOAN DOCUMENTS RELATING TO THE FOREGOING, (IV) GRANTING RELIEF FROM THE AUTOMATIC STAY, AND (V) <u>GRANTING OTHER RELATED RELIEF</u>**

I, Dr. Kenneth W. Wiles, hereby declare as follows:

  1. I, through my wholly owned entity Andare Corp, am the manager of Turnberry/MGM Grand Towers, LLC (the "<u>Tower A Debtor</u>"), a Nevada limited liability company, Turnberry/MGM Grand Tower B, LLC (the "<u>Tower B Debtor</u>"), a Nevada limited liability company, and Turnberry/MGM Grand Tower C, LLC (the "<u>Tower C Debtor</u>," and collectively, the "<u>Debtors</u>" or "<u>Borrowers</u>," and each a "<u>Borrower</u>"), a Nevada limited liability

company, debtors and debtors-in-possession.

2. Except as otherwise indicated, all facts set forth in this declaration are based upon my personal knowledge of the Debtors' operations and financing, information learned from my review of relevant documents, and information supplied to me by other members of the Debtors' management and the Debtors' various business and legal advisors.

3. I make this declaration in support of the *Motion for an Order: (I) Authorizing Post-Petition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Approving Loan Documents Relating to the Foregoing, (IV) Granting Relief from the Automatic Stay, and (V) Granting Other Related Relief* (the "Motion").[1]  If called upon to testify, I could and would do so.

4. The Debtors were the developers of high-rise condominium towers commonly referred to as The Signature Towers.  The Signature Towers consist of three towers referred to as "Tower A," "Tower B," and "Tower C," each containing 576 units, for a total of 1,728 units.

5. The Signature Towers' condominium units were sold to individual owners who at all times could and can use their units in any manner they chose, including, but not limited to renting out their units or residing in their units full time.

6. The Debtors are each Nevada limited liability companies, created to develop the three Signature Towers.  Each Debtor has two members: (i) a member affiliated with the Turnberry group of entities ("Turnberry"); and (ii) a member affiliated with MGM Resorts International ("MGM").  Each member has a 50% economic interest in such Debtor.  Specifically, Turnberry/Harmon Ave. LLC and MGM Grand Condominiums, LLC are the members of the Tower A Debtor; Turnberry/Harmon Ave. B LLC and MGM Grand Condominiums II, LLC are the members of the Tower B Debtor; and Turnberry/Harmon Ave. C LLC and MGM Grand Condominiums III, LLC are the members of the Tower C Debtor.  Each Debtor was formerly managed by its Turnberry-affiliated member.

---

[1] All capitalized terms not otherwise defined herein are as defined in the Motion.

2

ACTIVE 209465049

7. Prior to and since the Petition Date, Andare Corp ("Andare"),[2] which is my solely owned company,[3] was and is the independent manager for each of the Debtors.

8. Andare has broad managerial powers and independent control over the Debtors. In fact, none of the Debtors' respective members has authority to replace Andare as the Debtors' manager except upon: (i) my death, incapacity, or resignation from Andare; (ii) Andare's resignation as Debtors' manager; or (iii) for cause based on the gross negligence, willful misconduct, or breach of any obligation of Andare under its Engagement Letter as determined by a final, non-appealable order of a court of competent jurisdiction.

A. **Litigation Ensued After the Great Recession.**

9. At the time of the initial sale of units within The Signature Towers (approximately 2004-2006), the Las Vegas real estate market was extremely active, with significant increases in real estate prices being realized on an annual (and in many cases, monthly or quarterly) basis.

10. Shortly after the completion of the third Signature Tower, the "Great Recession" struck, pummeling the Las Vegas economy and devastating its real estate market. The Debtors were among its many victims.

11. After prices of Las Vegas real estate declined dramatically, with condominium units being particularly hard hit, and hotel occupancy rates plummeting in what has been one of the worst economic declines in the past century, a number of The Signature Tower purchasers filed suit seeking to rescind their real estate contracts, alleging the condominium units were sold to them as "securities."

12. Since then, litigation has been pursued in Nevada's Eighth Judicial District Court, the Nevada Federal District Court, the Nevada Supreme Court, this Court, the Ninth Circuit Court of Appeals, and the United States Supreme Court.

---

[2] Andare is a corporate financial advisory, valuation, restructuring, expert witness and consulting firm. The firm engages with senior management teams and boards of directors to drive operational improvements and apply new working methods to underperforming or distressed companies.

[3] My extensive experience and independence is discussed in detail in my declaration filed at ECF No. 23.

3

ACTIVE 209465049

**B.      The Commencement of the Chapter 11 Cases.**

13.     The Debtors' ongoing operations are limited to addressing the pending litigations and arbitrations and various remaining issues from the development of The Signature Towers.

14.     In service of those efforts, the Debtors desire to marshal the Debtors' remaining assets (described in greater detail below) and address claims raised by creditors in a manner that properly, appropriately, and fairly provides the Debtors with the ability to satisfy their creditors' legitimate and allowed claims and close the book on a project that was fully constructed and sold nearly ten years ago.

15.     Notwithstanding the Debtors' desire to address and resolve legitimate claims, the Debtors have remained thwarted in their efforts to do so and, after eight years and immense legal and arbitration fees and expenses, the Debtors remain at stage one, without meaningful discovery even having commenced in any of the arbitrations or litigations.

16.     Concurrently herewith, the Debtors' have filed their Bar Date Motion, which, among other relief, seeks the establishment of claims bar dates and a modified proof of claim form in order to allow the Debtors to streamline the claims process, better identify the class in which each claimant should be placed, and clarify the basis for the asserted claims, as well as minimize the burden on claimants by eliminating the need for filing potentially voluminous documentation from the various arbitration and litigation proceedings.

17.     Upon receipt of the proofs of claim by October 5, 2015 (the "Proposed Bar Date"), the Debtors, in consultation with any creditors' committee that may be appointed and other applicable parties, will be poised to file the Claims Resolution Protocol setting forth the Debtors' desired mechanism for resolving all proofs of claim and related litigation in a timely manner.

**C.      The Debtors' Assets on the Petition Date.**

18.     As set forth in the Debtors' Schedules [ECF Nos. 77, 79, and 80], as of the Petition Date, the Debtors held and continue to hold several significant assets, including, among others, the following:

4

ACTIVE 209465049

a.	Cash and certificates of deposit totaling $1,544,450 comprised of: (i) $877,261 held by the Tower A Debtor in its Bank of America, N.A. ("BOA") account ending in 3855 and $26,882 held by the Tower A Debtor in its BOA account ending in 7101; (ii) $572,691 held by the Tower B Debtor in its BOA account ending in 7300; and (iii) $67,616 held by the Tower C Debtor in its BOA account ending in 0390 (collectively, the "Cash").

b.	With the exception of the $26,882 held in the BOA account ending in 7101, the Cash is encumbered by the following three letters of credit issued by BOA in favor of ACE American Insurance Company ("ACE"), which insurance policies will terminate in April 2017; however, ACE periodically adjusts and reduces the required security as it determines is appropriate. Specifically:

(i) on September 27, 2004, the Tower A Debtor caused BOA to issue a standard letter of credit, number 3065725, in the amount of $1,262,400 in favor of ACE (the "Tower A LOC"). The original expiration date was September 27, 2005, but in accordance with the terms of the Tower A LOC, the expiration date has been extended for one year intervals, with the expiration date now being September 27, 2015. As of the Petition Date, the Tower A LOC had a balance of $869,220;

(ii) on December 1, 2005, the Tower B Debtor caused BOA to issue a standard letter of credit, number 3078832 in the amount of $568,080 in favor of ACE (the "Tower B LOC"). The original expiration date of the Tower B LOC was September 27, 2006, but in accordance with the terms of the Tower B LOC, the expiration date has been extended for one year intervals, with the expiration date now being September 27, 2015. As of the Petition Date, the Tower B LOC had a balance of $568,080; and

(iii) on November 21, 2005, the Tower C Debtor caused BOA to issue a standard letter of credit, number 3065725, in the amount of $1,162,700 (the "Tower C LOC, and collectively, the "LOCs"). The original expiration date of the Tower C LOC was November 21, 2006, but in accordance with the terms of the Tower C LOC, the expiration date has been extended for one year intervals, with the expiration date now

5

being November 21, 2015.  As of the Petition Date, the Tower C LOC had a balance of $62,700.

c.     In 2013, Hope Ippoliti, a former western regional controller for Turnberry West Realty, LLC was convicted of embezzling $5.6 Million from, among others, the Tower A Debtor.  The embezzlement occurred between May 2007 and January 2012 and $1,215,527.07 of the embezzled funds were the Tower A Debtor's funds.  The Tower A Debtor retains its claims with respect to the embezzlement, conversion, and fraud, as well as claims for aiding and abetting embezzlement, conversion, and fraud (the "<u>Embezzlement Claims</u>").

d.     The Debtors also retain other material litigation claims, indemnity claims, and avoidance actions.

19.    Thus, while the Debtors have significant assets, they are presently illiquid.  As a result, the Debtors require access to post-petition financing in order to fund their Chapter 11 Cases, pursuant to which they will monetize their assets, adjudicate their liabilities, and tender a distribution to legitimate creditors through a confirmed plan of reorganization.

**D.     <u>The Debtors Were Unable to Obtain Alternate Financing on Terms Similar to or Better than the DIP Loan.</u>**

20.    I, through Andare, negotiated the terms of the DIP Loan at length with the DIP Lenders.  As a result of these good faith, arm's length negotiations, Andare secured for the Debtors a DIP Loan on favorable terms, including the absence of any priming liens, interest due on the Maturity Date (and not monthly during the term of the DIP Loan), no obligation to pay fees or expenses of the DIP Lenders absent an Event of Default, and a sizeable budget for investigating potential claims against the DIP Lenders.

21.    Without unencumbered or traditional assets to serve as security or strong guarantees, the Debtors, through Andare, have been unable to obtain alternate financing on similar or better terms than provided through the DIP Loan.

22.    Andare has contacted several other institutional and non-institutional lenders seeking post-petition financing for the Debtors.  Not surprisingly, the institutional lenders contacted by Andare were unwilling to provide a loan without traditional collateral, such as real

estate, inventory, equipment, etc., to secure the loan.

23. Similarly, non-institutional lenders contacted by Andare, were unwilling to provide a loan on terms similar to or better than the DIP Loan. For instance, CFCIB and Advisors, LLC, which is in the business of providing financing for DIP loans, advised Andare that it would not be willing to provide the requested loan to the Debtors without also receiving strong guarantees (something Debtors cannot provide) and, even then, the interest rate would be above ten percent (10%) per annum (which is 5% higher than under the DIP Loan).

**E.    The Debtors' Need for Financing.**

24. The Debtors' ability to pay their independent manager and retained professionals, investigate and adjudicate claims asserted against them, investigate potential avoidance actions, and otherwise finance their operations post-petition is essential to the Debtors' ability to maximize the value of their estates and identify valid creditors and other stakeholders entitled to distributions. The Debtors do not have sufficient liquid assets in their estates available to finance their operation post-petition. As such, in the absence of the Debtors obtaining credit pursuant to Section 364, the Debtors' estates would suffer immediate and irreparable harm, including, without limitation, the inability to continue adjudicating claims asserted against them and monetizing their assets (including by liquidating their significant claims against third-parties) so that they can satisfy creditors' valid claims. The preservation, maintenance, and enhancement of the value of the Debtors are of the utmost significance and importance to a successful restructuring or liquidation of the Debtors.

25. The Debtors need approval of and access to the DIP Loan to fund the Chapter 11 Cases. The Debtors cannot meet their ongoing post-petition obligations unless they have the authorization to execute the Loan Documents and access the proceeds of the DIP Loan. In the absence of such access to funds, immediate and irreparable harm will result to the Debtors, their estates, and their creditors, rendering a reorganization or liquidation of the Debtors impossible and precluding any meaningful distribution to the Debtors' legitimate creditors. The Debtors believe that the terms and conditions of the DIP Loan Documents, and the proposed Order, and

the related relief requested herein are fair, reasonable, and in the best interests of the Debtors, their creditors, and their estates.

### F.     The Debtors Do Not Have an Alternative to the DIP Loan.

26.     While the value of the Debtors' assets exceeds $2 Million, as set forth in detail above, such assets are illiquid.  Without the DIP Loan, the Debtors' ability to successfully prosecute their Chapter 11 Cases will be jeopardized.

27.      The Debtors believe, based on their discussions with institutional and non-institutional lenders, that they could not obtain financing from any other lender on terms equally or more favorable than the terms of the DIP Loan offered by the DIP Lenders, and certainly not before all of the Debtors' limited cash resources were depleted by the search.  The Debtors, operating through their independent manager, Adare, exercised their best business judgment in negotiating the DIP Loan Documents and the Final Order that is presently before the Court.

28.      The DIP Lenders' offer to provide the DIP Loan as an administrative claim pursuant to Section 364(b) and a non-priming secured loan pursuant to Section 364(c)(1), (c)(2) and (c)(3), in an amount necessary to meet the Debtors' working capital needs on the terms, and within the time frame provided, simply cannot, in the judgment of the Debtors, be matched by any third-party lender.

29.     The DIP Lenders have already performed all the due diligence necessary in connection with the DIP Loan and, thus, are well positioned to provide post-petition financing to the Debtors.

30.     Approval of the DIP Loan will provide the Debtors with immediate and ongoing access to funds so that the Debtors can avoid harm to their estates and potential erosion of the value of their assets.  Absent access to the DIP Loan, the Debtors will not have sufficient available sources of working capital and financing to successfully liquidate their assets, resolve the numerous claims asserted against them, and tender a distribution to the Debtors' legitimate creditors through a plan of reorganization.

ACTIVE 209465049

31. The funds provided under the DIP Loan will enable the Debtors to prosecute their Chapter 11 Cases in an orderly and reasonable manner that preserves and enhances the value of the estates.

32. During negotiations, all parties were represented by counsel. Although the DIP Lenders are affiliated with the members of the Debtors, I, through the Debtors' independent manager, Andare, negotiated the DIP Facility solely in pursuit of the best interests of the Debtors and their estates. The Debtors believe that the terms of the DIP Loan are fair and reasonable under the circumstances, and that the DIP Lenders are entitled to the benefits of Section 364(e).

I declare under penalty of perjury of the laws of the United States that these facts are true to the best of my knowledge and belief.

DATED this 31st day of July, 2015.

_____
DR. KENNETH W. WILES

ACTIVE 209465049