GARMAN TURNER GORDON LLP
GREGORY E. GARMAN, ESQ., NV Bar No. 6654
E-mail:  ggarman@gtg.legal
GERALD M. GORDON, ESQ., NV Bar No. 0229
E-mail:  ggordon@gtg.legal
TALITHA GRAY KOZLOWSKI, ESQ., NV Bar No. 9040
E-mail:  tgray@gtg.legal
GABRIELLE A. HAMM, ESQ., NV Bar No. 11588
E-mail: ghamm@gtg.legal
650 White Drive, Suite 100
Las Vegas, Nevada 89119
Telephone (725) 777-3000; Facsimile (725) 777-3112
*Attorneys for Debtors*

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re: | Case No.: 15-13706-abl |
| TURNBERRY/MGM GRAND TOWERS, LLC, | Chapter 11 |
| ☒ Affects this Debtor. | **JOINTLY ADMINISTERED UNDER CASE NO.: 15-13706-abl** |
| In re : | |
| TURNBERRY/MGM GRAND TOWER B, LLC, | Case No.: 15-13708-abl |
| ☒ Affects this Debtor. | Chapter 11 |
| In re : | Case No.: 15-13709-abl |
| TURNBERRY/MGM GRAND TOWER C, LLC | Chapter 11 |
| ☒ Affects this Debtor. | Date:  August 31, 2015 |
| | Time: 9:30 a.m. |

## DEBTORS' REPLY IN SUPPORT OF MOTION FOR AN ORDER: (I) AUTHORIZING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) APPROVING LOAN DOCUMENTS RELATING TO THE FOREGOING, (IV) GRANTING RELIEF FROM THE AUTOMATIC STAY, AND (V) GRANTING OTHER RELATED RELIEF

Turnberry/MGM Grand Towers, LLC, a Nevada limited liability company (the "Tower A Debtor"), Turnberry/MGM Grand Tower B, LLC, a Nevada limited liability company (the "Tower B Debtor"), and Turnberry/MGM Grand Tower C, LLC, a Nevada limited liability company (the "Tower C Debtor," and collectively, the "Debtors"), debtors and debtors-in-possession, hereby submit this reply to the sole opposition to *Debtors' Motion for an Order:  (I) Authorizing Post-*

*Petition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Approving Loan Documents Relating to the Foregoing, (IV) Granting Relief From the Automatic Stay, and (V) Granting Other Related Relief* [ECF No. 95] (the "<u>Motion</u>"), the opposition (the "<u>Opposition</u>") of KJH & RDA Investor Group, LLC and an ever-shifting group of purported plaintiffs (the "<u>Claimants</u>")[1] in prepetition litigation against, among the Debtors, solely the Tower A Debtor [ECF No. 113].

This reply is made and based upon the memorandum of points and authorities provided herein, the Declaration of Jean-Paul Hendricks (the "<u>Hendricks Declaration</u>"), filed contemporaneously herewith, the papers and pleadings on file herein, judicial notice of which is respectfully requested, and any argument of counsel entertained by the Court at the time of the hearing of the Motion.

## I.
## INTRODUCTION

It does not take a careful reading of the Opposition to see that the true motive of the Claimants and their counsel is not to oppose the Motion, but to obtain an advantage in their ongoing litigation by denying the Debtors the ability to efficiently and economically address the claims of all creditors through the Chapter 11 process, or better yet, obtain either the dismissal of the Chapter 11 Cases or conversion to Chapter 7 without having to file and justify motions seeking such relief. While the Claimants' allegations make for an interesting story, albeit one that is more fiction than fact, they are not pertinent to the relief requested by the Debtors – the authorization of postpetition financing under Sections[2] 361, 362, 363 and 364. The DIP Loan[3] satisfies the requirements of the Bankruptcy Code, is a valid exercise of the Debtors' business judgment, and is in the best interests

---

[1] That it is literally impossible to get a straight answer regarding the identities of the Claimants from counsel for the Claimants underscores the reason for Bankruptcy Rule 2019 and the filing of Debtors' *Motion to Require Rule 2019 Disclosures*.

[2] All references to "Chapter" and "Section" herein shall be to the Bankruptcy Code appearing in Title 11 of the U.S. Code; all references to "Bankruptcy Rule" shall refer to the Federal Rules of Bankruptcy Procedure; and all references to "Local Rule" shall refer to the Local Rules of Bankruptcy Practice of the U.S. District Court for the District of Nevada.

[3] All capitalized terms not defined herein have the meanings ascribed to them in the Motion and the DIP Loan Agreement attached thereto as Exhibit "1."

2

of the Debtors' estates, and, accordingly, should be approved.

**II.**
**ARGUMENT**

**A.    Claimants' "Factual Background."**

The "factual background" set forth in the Opposition is anything but factual.  As it fails to rely on a single item of admissible evidence and contains nothing but argument, it should be disregarded in its entirety.  While irrelevant, a few of the most egregious fabrications should be addressed in order to avoid allowing this Court to be materially misled.

First, Claimants' contention that "the first three motions to dismiss filed by all the defendants have already been denied" (Opp., p. 2) is patently false.  As set forth in the Hendricks Declaration, many of the claims against Tower A Debtor and the non-debtor defendants have, in fact, been dismissed, some with prejudice and some without prejudice.  See Hendricks Decl., ¶ 6.

Second, the Claimants' allegation that the defendants have sought to avoid discovery "at all costs" is baseless.  The only discovery that has been ordered to date is in the KJH cases, and then only on a limited basis.  See Hendricks Decl., ¶¶ 7, 8.  The delays in the prepetition litigation have largely been caused by the Claimants' failure to properly plead their claims, seeking, repeatedly and without legal basis, to certify a class, and attempting to compel parties who were not parties to the Purchase and Sale Agreements, and therefore not parties to any arbitration agreement, to arbitrate their claims.

Third, Claimants contend, on page 2 of the Opposition and in paragraph 2 of the declaration of Normal Blumenthal filed in support thereof (the "Blumenthal Declaration") [ECF No. 116], that (i) the Claimants are the only persons who have filed claims within the statute of limitations, (ii) the Claimants are approximately 539 persons who were the original purchasers of approximately 500 units, and (iii) other creditors cannot assert claims because their statutes of limitations have long run.  First, as provided in the Hendricks Declaration, Claimants' counsel have reasserted in the KJH action that the Claimants should be certified as class representatives on behalf of these other unnamed creditors, which renders these statements at best misleading.  See Hendricks Decl., ¶¶ 3-4.  Second, to the extent the Claimants' "property claims" (i.e., invalidation of the CC&Rs,

nuisance, trespass, and related claims) against Tower A Debtor have any merit, any judgment or order against Tower A Debtor would inure to the benefit of all owners and residents of The Signature Towers, and it is not clear whether a limitations period would apply to these claims, particularly if the alleged nuisance and trespass are continuing.[4]  See Hendricks Decl., ¶ 5. Third, counsel for the Claimants cannot credibly contend that the Claimants in the prepetition litigation are all of the potential creditors of the Debtors, when counsel for the Claimants does not even seem to know for sure who they represent.  Every complaint filed by counsel in the prepetition litigation contains a different group of named plaintiffs, and plaintiffs identified in the caption are often not identified in the body of the complaints, and vice versa.  See, e.g., Hendricks Decl., Exh. 2, Exh. 9.  Moreover, recent papers filed by the Claimants in these Chapter 11 Cases, *including the Opposition*, identify Claimants that have never been named plaintiffs in the prepetition litigation, in any forum.

Fourth, Claimants' contention, without support of any admissible evidence, that the Debtors are purely "shell entities" presumes the outcome of litigation matters that are in their infancy.  Claimants have a long and uphill battle to prove their "alter ego" cause of action against the non-debtor defendants.  Debtors agree that they are special purpose entities that were created for the purpose of developing and constructing The Signature Towers, but this does not make them "shell entities" as alleged by the Claimants, nor does it either mandate or merit alter ego treatment with affiliates, including a public, multi-national corporation.

Fifth, Claimants' repeated contention that the Debtors have "no assets" is just wrong.  As set forth in the Motion and the Declaration of Dr. Kenneth Wiles filed concurrently with the Motion (ECF No. 96) (the "Wiles Decl."), the Debtors have bank deposits securing letters of credit and are entitled to a portion of the restitution paid as a result of an embezzlement.  However, these assets are neither immediately available nor liquid, and as a result, the Debtors are unable to fund administrative expenses on a timely basis.

---

[4] Further, of the three Debtors, only the Tower A Debtor is a named party to the various actions. However, Claimants contend, on page 2 of the Opposition and in paragraph 2 of the Blumenthal Declaration, that "…litigation that the **Debtors** are currently subject to arose more than 8 years ago… "

4

The only aspect of the Claimants' recitation of their version of the facts which is correct is the contention that Debtors are not operating a business in the traditional sense, but have limited their ongoing operations to resolving the pending litigations and arbitrations and various remaining issues from the development of The Signature Towers.  See Wiles Decl., ¶ 13.  However, contrary to the suggestion of the Claimants, a debtor is not prohibited from using the tools provided by the Bankruptcy Code, including those which are unique to the bankruptcy process such as avoidance actions under Sections 544, 547, 548 and 550, which provide a debtor with the ability to pursue causes of action and collect and monetize its assets in order to satisfy its legitimate and allowed claims, and ultimately, wind down its business.  See id., ¶ 14.

Notwithstanding the Debtors' desire to address and resolve those legitimate claims, the Debtors have remained thwarted in their efforts to do so and, after *eight years* and immense legal fees and arbitration costs, the Tower A Debtor remains at stage one, without meaningful discovery having commenced in any of the arbitrations or litigation.  See id., ¶ 15.

**B.    The DIP Loan Agreement is Not a *Sub Rosa* Plan of Reorganization.**

First, it isn't clear that the *sub rosa* concern applies to anything other than sales under Section 363 and settlement agreements.  See In re McClure, No. 1:13-BK-10386-GM, 2015 WL 1607365, at *8 (Bankr. C.D. Cal. Apr. 2, 2015), citing Institutional Creditors of Continental Air Lines v. Continental Air Lines, Inc. (In re Continental Air Lines, Inc.), 780 F.2d 1223, 1227-28 (5th Cir.1986) ("In Braniff we recognized that a debtor in Chapter 11 cannot use § 363(b) to sidestep the protection creditors have when it comes time to confirm a plan of reorganization."); Clyde Bergemann, Inc. v. Babcock & Wilcox Co. (In re Babcock & Wilcox Co.), 250 F.3d 955, 960–961 (5th Cir. 2001) ("Braniff stands merely for the proposition that the provisions of § 363 permitting a trustee to use, sell, or lease the assets do not allow....); In re Mega-C Power Corp., No. BAP NV-06-1060-BSJ, 2006 WL 6810965 (B.A.P. 9th Cir. Sept. 29, 2006) (settlement context); In re Equa-Chlor LLC, No. 08-40599, 2008 WL 1927066, at *4 (Bankr. W.D. Wash. Apr. 29, 2008) (settlement context).

Second, even if the *sub rosa* concern *can* apply to a postpetition financing agreement, it certainly doesn't apply here.  First, the Claimants' Opposition does not specify exactly what protections they would receive in the Chapter 11 plan process that are denied by way of the DIP Loan Agreement.  That the DIP Loan may have an impact on the Debtors' confirmation of a plan is insufficient to raise the specter of a *sub rosa* plan.  See Continental, 780 F.2d at 1227-28 (revisiting Braniff and holding that "when an objector to a proposed transaction under § 363(b) claims that it is being denied certain protections because approval is sought pursuant to § 363(b) instead of as part of a reorganization plan, the objector must specify exactly what protection is being denied."); Official Comm. of Unsecured Creditors v. Cajun Elec. Power Coop. (In re Cajun Elec. Power Coop.), 119 F.3d 349, 354 n.3 (5th Cir.1997) ("(t)he Committee ... listed various procedural protections afforded by Chapter 11, such as the right to a disclosure statement providing adequate information about any proposed plan. Missing from this recitation is any indication of how the Committee might lose these protections if the settlement is approved.").  Claimants' failure to identify the protections they claim to lose as a result of the DIP Loan is fatal to their objection.

Third, courts have consistently held that to constitute a *sub rosa* plan, an agreement must have the effect of dictating the terms of a prospective plan, meaning it must dispose of all claims against the estate or restrict creditors' rights to vote.  E.g., In re Capmark Fin. Grp. Inc., 438 B.R. 471, 513-14 (Bankr. D. Del. 2010), citing Official Comm. of Unsecured Creditors of Tower Auto. v. Debtors & Debtors in Possession (In re Tower Auto. Inc.), 241 F.R.D. 162, 168 (S.D.N.Y.2006); In re Cajun Elec. Power Coop., 119 F.3d at 354–55; In re Energy Future Holding Corp., 527 B.R. 157, 169 (D. Del. 2015) ("Appellant has not demonstrated how the [settlement agreement] by itself disposes of all claims against the estate or restricts creditors' rights to vote."), appeal docketed Mar. 16, 2015; Suntrust Bank v. Den-Mark Const., Inc., 406 B.R. 683, 702-03 (E.D.N.C. 2009) (financing order was not a *sub rosa* plan where it "did not affect all of the debtor's assets or all of its creditors.") (citations omitted); In re Mirant Corp., No. 03-46590(DML)11, 2005 WL 1000266, at *5 (N.D. Tex. Apr. 14, 2005) ("In determining whether a settlement is a *sub rosa* plan, courts

have focused on three main factors. First, does the transaction dictate the terms of a future plan of reorganization. Second, does the transaction preclude creditors from participating in the plan process and, third, does the transaction dispose of all of a debtor's assets."); In re Mega-C Power Corp., 2006 WL 6810965, at *6 (a transaction is a *sub rosa* plan when it "dictate[s] plan terms, essentially binding creditors to a particular distribution scheme" which was not the case before the court); In re Defender Drug Stores, Inc., 145 B.R. 312, 318 (B.A.P. 9th Cir. 1992) (no *sub rosa* plan where financing transaction did not "have the effect of or dictate the terms of a future reorganization plan."), citing Continental Airlines, 780 F.2d at 1226-28); Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1313 (5th Cir. 1985) (restrictions on debtor's parent company's actions in amended lease "do not alter creditors' rights, dispose of assets, and release claims to the extent proposed in the wide-ranging transaction disapproved in [Braniff]").

In no way does the DIP Loan Agreement prevent the Claimants from voting in whatever manner they so choose on any proposed plan.[5]  It does not dictate the terms of a future plan.  It does not restructure the rights or priorities of the Debtors' creditors.  It does not mandate a distribution scheme.  It is not a *sub rosa* plan of reorganization under any interpretation of that term.

## C.   Factors Considered in Determining Whether to Approve DIP Financing.

As described in the Motion, the Debtors have concluded that without the DIP Loan, the Debtors' ability to successfully prosecute their Chapter 11 Cases would be jeopardized, and based on their discussions with institutional and non-institutional lenders, that they could not obtain financing from any other lender on terms equally or more favorable than the DIP Loan offered by the DIP Lenders.  The decision to borrow funds is subject to the same business judgment standard applicable to other business decisions.  See Group of Inst'l Investors v. Chicago Mil. St. P. & Pac. Ry., 318 U.S. 523, 550 (1943); In re Ames Dep't Stores, Inc., 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (applying business judgment standard); see also In re Yellowstone Mountain Club, LLC,

---

[5] The most likely provision  that Claimants are focused on is the Event of Default provision regarding the filing of a plan which is not acceptable to the DIP Lenders.  However, this does not forbid the filing of such a plan, but provides for the consequence of doing so on the DIP Loan.

2008 WL 5869859 (Bankr. D. Montana, November 26, 2008) (acknowledging the use of the business judgment standard with respect to approval of Section 364 financing).

In determining whether to authorize postpetition financing, courts generally consider: (1) whether the proposed financing is an exercise of sound and reasonable business judgment; (2) whether alternative financing is available and whether any better offers or timely proposals are before the Court; (3) whether the financing is in the best interests of the estate and its creditors; (4) whether the credit transaction is necessary to preserve the assets of the estate and is necessary, essential, and appropriate for the continued operation of the debtor's business and the preservation of its estate; (5) whether the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor and the proposed lender; and (6) whether the financing agreement was negotiated in good faith and at arm's length.  See, e.g., In re Farmland Indus., Inc., 294 B.R. 855, 879-80 (Bankr. W.D. Mo. 2003), citing In re Western Pacific Airlines, Inc., 223 B.R. 567 (Bankr. D. Colo. 1997), In re Phase–I Molecular Toxicology, Inc., 285 B.R. 494 (Bankr.D.N.M.2002), In re WorldCom, Inc., No. 02-13533(AJG), 2002 WL 1732646, at *3 (Bankr. S.D.N.Y. July 22, 2002).

As set forth in the Motion and the evidence submitted in support thereof, the Debtors have established that the DIP Loan will provide the Debtors with immediate and ongoing access to funds so that the Debtors can meet their administrative expense obligations on a timely basis.  Absent the DIP Loan, the Debtors will not have sufficient sources of liquid capital to resolve the numerous claims asserted against them, liquidate their assets, including prosecution of causes of action owned by the estate, and make a distribution to the Debtors' legitimate creditors through a plan of reorganization.  See Wiles Decl., ¶ 30.  The funds that will be provided under the DIP Loan will enable the Debtors to prosecute their Chapter 11 Cases in an orderly and reasonable manner that preserves and enhances the value of the estates for the benefit of creditors with allowed claims. See id., ¶ 31.

The Claimants' Opposition makes much of the fact that the Debtors are not operating a business.  While the Opposition raises this in the context of a requisite for approval of the DIP

8

1  Loan, it really is a stealth attach on the eligibility of the Debtors for Chapter 11 relief.  On either

2  basis, the argument fails.  Nothing in the Bankruptcy Code, in Section 109 regarding eligibility

3  under Chapter 11, in Section 101(41) defining a "person" eligible under Section 109, or in Chapter

4  11 itself, requires an "operating" business as defined by the Claimants.  Likewise, conducting

5  traditional business operations is not a prerequisite to obtaining postpetition financing.  In In re

6  MSR Hotels & Resorts, Inc., Five Mile Capital, who had been engaged in lengthy litigation with

7  the debtor and its affiliates, opposed the debtor's motion for approval of a DIP loan from its

8  affiliate on similar grounds, alleging that a debtor without ongoing operations could not obtain

9  postpetition financing and that the real reason for the filing was to derail the adversary proceeding

10 commenced by Five Mail and shift the defense costs from the non-debtor defendants to the debtor,

11 and therefore, that the chapter 11 case had no legitimate purpose.   In re MSR Hotels & Resorts,

12 Inc., No. 13-11512 (SHL), slip. op., 2013 WL 5716897 (Bankr. S.D.N.Y. Oct. 1, 2013).  The

13 debtor did not disagree that it was not operating its business and that the DIP loan would be used

14 primarily to pay professional fees.  Id.

15         Though the court ultimately denied the financing motion, without prejudice, because the

16 debtor had not entered into a definitive loan agreement or sought financing from another source,

17 the court rejected Five Mile's reasoning, stating that "Five Mile acknowledges, as it must, that

18 Chapter 11 plans of liquidation are, in fact, permissible."   Id., citing Abel v. Shugre (In Re

19 Ionosphere Clubs, Inc.), 184 B.R. 648, 654 (S.D.N.Y.1995) ("While the primary purpose of

20 Chapter 11 is reorganization, liquidation is not prohibited.").

21         Challenging the creditor's assumption that the Chapter 11 case served no purpose, the court

22 went on to state:

23         In certain instances, a Chapter 11 liquidating plan is preferable to a Chapter
           7 proceeding because the disposition of assets will be conducted in a less-
24         expensive, swifter and more orderly manner by a debtor-in-possession, as
           opposed to a trustee, who ... is a third party, unfamiliar with the property of
25         the estate.... Thus, if the debtor's filing is based on its economic realities and
           consistent with a legitimate reorganization purpose, liquidation under
26         Chapter 11 is in fact valid.

27 Id., quoting In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 985–86 (Bankr.N.D.N.Y.1988).
28

9

Similar to the Chapter 11 Cases now before the Court, the <u>MSR Hotels</u> court noted that the case encompassed a long history of protracted and contentious litigation between Five Mile, on the one hand, and various parties on the other, making the Chapter 11 necessary for the debtor to implement a sale of its assets free of litigation.  <u>Id.</u>  Furthermore, the court noted, denying the financing "would give Five Mile leverage over the debtor by impairing its ability to defend against litigation that Five Mile continues to bring in this case, without exception."  <u>Id.</u>  Similarly, the Debtors in this case may not have an ongoing business to finance, but they have assets to administer, creditors to pay, and litigation claims to resolve.  The Debtors cannot comply with their fiduciary duties to all creditors *and* their equity holders by merely allowing the Claimants to take a judgment against them based on meritless claims.

**D.**    <u>**The Terms of the DIP Loan Agreement are Fair and Reasonable.**</u>

The Claimants do not identify a single term of the DIP Loan which is impermissible under Sections 361, 362, 364 or 364.  Rather, the Claimants merely complain about the terms of the DIP Loan.  However, the DIP Loan Agreement was negotiated by the Debtors' independent fiduciary and counsel with the Lenders.  The results of the Debtors' negotiations are not perfect, and there are several terms of the DIP Loan that the Debtors wish were more favorable.  But those better terms are not available to the Debtors, the terms in the DIP Loan Agreement are the best terms that the Debtors could obtain, and the terms of the DIP Loans are fair and reasonable and under the circumstances of these Chapter 11 Cases.  The relevant standard is whether the terms are fair and reasonable, not whether they are perfect.  In <u>In re Ellingsen MacLean Oil Co.</u>, the court noted:

> Some of the terms of the bargain reached between debtor and creditor may reach beyond the usual terms of a loan agreement.  However, such terms are perfectly normal considering the 'unusual' situation of a bankrupt firm.  In such situations the bankruptcy court would rightfully be more interested by the requirements and provisions of section 364 of the Code, than it would be by a picayune examination of every legal argument that could be brought against separate provisions of the proposed agreement.

65 B.R. 358, 365 (W.D. Mich. 1986), <u>aff'd</u>, 834 F.2d 599 (6th Cir. 1987).  <u>See also</u> <u>In re Farmland Indus., Inc.</u>, 294 B.R. at 886 ("it is not impermissible for a bank to use its superior bargaining power to obtain creditor-favorable terms in a financing agreement.") (citations omitted).  As the

court stated in <u>In re Defender Drug Stores</u>, cited by the Claimants, "Section 364 . . . expressly allows courts to authorize certain protections designed to assure repayment of postpetition lenders. Bankruptcy courts, however, have regularly authorized postpetition financing arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364." <u>In re Defender Drug Stores</u>, 145 B.R. at 316-17. Each of the Claimants' specific complaints, set forth in Exhibit "B" to the Opposition, must be rejected.

### 1. The Definition of "DIP Collateral".

First, Claimants' object to the definition of "DIP Collateral" as too broad, arguing that it should not reach to (i) commercial tort claims or (ii) insurance or settlement proceeds that the "*plaintiffs*" may obtain from the Debtors' affiliates that may come into the Debtors' estates.[6] This objection is unwarranted, overreaching, and unsupported by applicable law.

By the very terms of Section 364, the DIP Collateral can only encompass property of the Debtors' estates and would include recoveries by the Debtors from third parties, including from Debtors' members and Affiliated Entities. Property of the Debtors' estates will not include recoveries by third parties, including the Claimants, which are the proceeds of actions and claims which belong solely to the Claimants; again, not arising out of actions or claims that are property of the Debtors' estates such as avoidance actions pursuant to Sections 544, 547, 548 and 550. Further, subsection (ii) of paragraph 12 of the Proposed Order, in defining DIP Collateral, expressly excludes claims or causes of action against any of the Debtors' members or Affiliated Entities, together with any proceeds or recoveries related to such actions or claims. Therefore, given that there is an exclusion for recoveries by the Debtors from their members and Affiliated Entities, what the Claimants are seeking by way of this objection is an allocation (or earmarking) of the Debtors' claims and recoveries against its members or Affiliated Entities in favor of the Claimants to the detriment of other possible creditors with allowed claims, which is inappropriate with regard to a Section 364 extension of credit, and in the broader context of the Chapter 11

---

[6] It is assumed by the manner in which the objection is grammatically structured, the reference to recoveries by the plaintiffs only refers to insurance proceeds or settlement proceeds, but if it also refers to Commercial Tort claim recoveries, then the analysis below is applicable to both assertions.

1    Cases, unsupported by any applicable provision of the Bankruptcy Code.

2    With specific regard to commercial tort claims, other than the exclusions in (i) and (ii) of

3    paragraph 12 of the Proposed Order defining DIP Collateral, there is no reason why such claims

4    and the recoveries and proceeds thereof should not be included in DIP Collateral.

5    Nonetheless, for the sake of clarity, the Debtors suggest that the sentence in paragraph 12

6    of the Proposed Order beginning with "For the avoidance of doubt, …" be amended to state:  "For

7    the avoidance of doubt, and subject to the provisions of this Paragraph 12, the DIP Collateral shall

8    include, without limitation…"

9           **2.**      <u>**The DIP Superpriority Claim.**</u>

10    Claimants further object that while avoidance actions and claims against insiders and the

11    proceeds thereof are carved out of the definition of "DIP Collateral," they are not carved out from

12    the DIP Superpriority Claim.  This objection is misplaced in that it confuses the scope of collateral

13    and the security granted in such collateral with claims priority.  The Carve Out from DIP Collateral

14    limits the scope of the DIP Collateral and does not equate with the priority of an administrative

15    claim.  The Claimants are seeking, in essence, some form of equitable subordination of the right

16    of the DIP Lenders to recover the balance due on the DIP Loan from the Debtors' estates arising

17    from a shortfall of the DIP Collateral, which should be overruled as there is no basis for such

18    subordination.  The Loans are secured by the DIP Collateral, and in addition, to the extent of the

19    amount drawn, the Lenders are also granted a priority in payment over other administrative claims

20    (subject to the Carve Out).  However, as a practical matter, given the Carve Out and the Budget

21    providing for administrative expenditures consistent with the Budget, the "superpriority" aspect of

22    the DIP Lenders' claim is not material.

23           **3.**      <u>**Release/Indemnification/No Alter Ego.**</u>

24    Claimants object to the term of the DIP Loan Agreement which provides that the DIP Loan

25    Agreement may not be used as evidence of "alter ego," and Debtors' obligation to indemnify the

26    DIP Lenders for claims in connection with the DIP Loan, seeking clarification of these terms.

27    With regard to paragraphs 20 and 25 of the Proposed Order and paragraph 9 of the DIP Loan

28    Agreement, the Debtors spent significant time with the Lenders negotiating and drafting these

provisions to avoid any question or doubts that these specific disclaimers, releases and indemnifications relate solely to the DIP Loan and the transactions related thereto.  There is no intent by the Debtors to release the DIP Lenders from any avoidance claims or prepetition claims, the language of the Proposed Order and DIP Loan Agreement are clear and unambiguous in this regard, and no clarification is needed.

          **4.**        **Mandatory Prepayment.**

Claimants object to the mandatory prepayment provision found in §§ 3(a)(iii) and 2(a)(i) of the DIP Loan Agreement, which requires Debtors to pay down any borrowings if they hold unrestricted cash of greater than $250,000 for at least 3 consecutive business days, and once paid down, these amounts cannot be re-borrowed.  While the Debtors would prefer this term be eliminated as well, this term was heavily negotiated with the DIP Lenders, with the Debtors taking into consideration both their cash flow and expense needs, the Budget, and availability of other assets.  The Claimants make the unfounded charge that because of this sweep mechanism (which excludes the Embezzlement Claims Proceeds), the DIP Loan is "illusory" and the Debtors are "potentially administratively insolvent."  This is simply not so given the ability of the Debtors to borrow the funds necessary to maintain the Debtors during the administrative period as well as the other assets of the estates, though presently illiquid.

          **5.**        **Use of Proceeds.**

Claimants further object to the provision in paragraph 6(f) of the DIP Loan Agreement whereby the Debtors are restricted in the use of the DIP Collateral, specifically prohibiting Debtors from using the DIP Collateral in ways adverse to the DIP Lenders.  Such provisions are common-place in DIP loan agreements and agreements for the use of cash collateral; the underlying premise being that it is reasonable for a lender to restrict its funds from being used as a war chest against it.

However, it appears that the Claimants' objection actually is predicated upon a strained reading of subsection (iv) of the last sentence of paragraph 6(f).  This subsection provides that the Debtors cannot use any proceeds of the DIP Loan or Cash Collateral "(iv) to finance in any way the arbitration of any claims (as defined in section 101 of the Bankruptcy Code) asserted against

the Debtors without the prior consent of the Required Lenders . . . ."  The Debtors do not object to this provision and understand the rationale for the DIP Lenders insisting upon its inclusion.  First, the Debtors have no intention of litigating the claims of the Claimants in arbitration – even with the DIP Loan, the Debtors cannot afford to continue the prepetition litigation commenced by the Claimants.  The Debtors intend to pursue an orderly identification and allowance procedure before the Bankruptcy Court to determine allowed claims (and not limited to the Claimants despite their self-serving assertion that they are the only claimants in the Chapter 11 Cases) as provided for under the Bankruptcy Code and Bankruptcy Rules.  Second, this provision is not applicable to assets which are not proceeds of the DIP Loan.  Third, if it ultimately decided that the arbitrations would go forward, these funds can be used with the consent of the Requisite Lenders, and assets which are not DIP Collateral can likewise be used.  Fourth, it should not be forgotten that the pending arbitrations only involve Tower "A"; Tower B Debtor and Tower C Debtor are not (and have never been) parties to any of the prepetition litigation.

## 6.    Events of Default.

Finally, Claimants take issue with several of the Events of Default, which are milestones for performance or related to, for instance, the Debtors losing the exclusive right to file a plan.[7] First, as a general note, these Events of Default are commonplace in postpetition loan and cash collateral agreements.  Lenders under Section 364 and parties allowing for the use of cash collateral under Section 363 have an interest in the efficient and orderly administration of a chapter 11 case and ensuring that their loan proceeds and cash collateral are being used to make progress in the Chapter 11 case.  As for the items specifically mentioned in the objection, these were, as with the terms discussed above, heavily negotiated with the DIP Lenders and are acceptable to the Debtors. First, as to the milestones regarding resolution of claims, the DIP Lenders have agreed to lend funds to the Debtors for specifically this purpose – an efficient and expedient process to resolve

---

[7] As for the latter, the plaintiffs use this as an example without naming any other "inappropriate and overbroad" examples.  However, the same analysis would apply to any of the other Events of Default, including, but not limited to, the appointment of a trustee or an examiner with expanded powers, dismissal or conversion of the Cases, or actions or orders prejudicing the Lenders rights under the DIP Loan Documents or the Proposed Order.

and administer claims against the Debtors, something which has not happened over the 8 years since the Claimants commenced their litigations.  Second, with specific regard to the loss of exclusivity, if such an event were to occur, it is safe to assume that the costs of administration of the Chapter 11 Cases will balloon and given competing plans, the time that it will take to confirm a plan of reorganization will be inordinately extended.  The Lenders did not agree to finance these types of contingencies.  In fact, the Lenders insisted upon the inclusion of this Event of Default, as is regularly done by dip lenders.  Finally, the statement that these are in the "nature of case control covenants" is without merit or substantiation and are addressed in this Reply regarding the assertion that the DIP Loan is in the nature of a *sub rosa* plan.

## III.
## CONCLUSION

The record established by the declarations submitted in support of the DIP Motion demonstrates beyond doubt that the DIP Loan meets the requirements of Section 364 of the Bankruptcy Code.  The Debtors have reasonably exercised their sound business judgment, there is no alternative or better financing available, and the DIP Loan is in the Debtors' best interest and necessary to preserve their estates.  Moreover, the terms of the DIP Loans are fair and reasonable and were negotiated in good faith.


GARMAN TURNER GORDON


By: */s/ Talitha Gray Kozlowski*
    GREGORY E. GARMAN, ESQ.
    GERALD GORDON, ESQ.
    TALITHA GRAY KOZLOWSKI, ESQ.
    GABRIELLE A. HAMM, ESQ.
    *Attorneys for Debtors*