1
2
3
4
5
6

FENNEMORE CRAIG, P.C.
Thomas H. Fell (No. . 003717)
Anthony W. Austin (No. 025351)
300 S. Fourth Street, Ste. 1400
Las Vegas, NV 89101
Telephone:  (702) 692-8000
E-Mail:  tfell@fclaw.com
          aaustin@fclaw.com

*Attorneys for Creditor KJH & RDA Investor Group, LLC*

7

## UNITED STATES BANKRUPTCY COURT

8

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| In re:<br><br>TURNBERRY/MGM GRAND TOWERS, LLC,<br>☒ Affects this Debtor. | Case No. 15-13706-abl<br>Chapter 11<br><br>**JOINTLY ADMINISTERED UNDER**<br>**CASE NO.: 15-13706-abl** |
| In re:<br><br>TURNBERRY/MGM GRAND TOWER B.,<br>LLC,<br>☒ Affects this Debtor. | Case No. 15-13708-abl<br>Chapter 11 |
| In re:<br><br>TURNBERRY/MGM GRAND TOWER C,<br>LLC,<br>☒ Affects this Debtor. | Case No. 15-13709-abl<br>Chapter 11<br><br>**MOTION FOR AN ORDER**<br>**DISMISSING CASES OR, IN THE**<br>**ALTERNATIVE, CONVERTING**<br>**CASES TO CHAPTER 7**<br><br>Date:  October 19, 2015<br>Time: 9:30 a.m. |

Creditors KJII & RDA Investor Group, LLC, and those individuals and entities listed and identified in the Verified Statement of Fennemore Craig, P.C. Pursuant to Bankruptcy Rule 2019 [Doc. No. 194] ("Plaintiffs"), by and through their counsel, Thomas H. Fell, of the law firm of Fennemore Craig, respectfully request this Court enter an order dismissing these cases, or, in the alternative, converting these cases to Chapter 7.

///

///

10805167.1/037967.0002

# INTRODUCTION

Plaintiffs respectfully submit that the motion to dismiss these cases should be granted for multiple reasons.  First, dismissal is appropriate based on the Debtors' inability to effectuate a plan in light of the admitted facts that they have no significant assets, income or business operations.[1] The Debtors were formed as limited liability shell companies by LLC members, who are affiliates of MGM and Turnberry (the "Members") to market and sell hotel condominium units.  Those sales were completed in  2007 and the remaining sales proceeds were then transferred by the Debtors to the Members. The Debtors have had no business operations since then.[2]  Therefore dismissal is warranted because Debtors have no assets, income, operations or likelihood of rehabilitation.

Dismissal is also warranted under Bankruptcy Code Section 305(a)(1) because the disputes herein could be more efficiently resolved in proceedings pending in an alternative forums  and because these bankruptcy cases were filed for improper purposes.  Three lawsuits are on the verge of discovery and trial after seven years of motion practice. Debtors have no real assets to protect and no equity interests of value to preserve, no business operations, and, therefore, no likelihood of rehabilitation.  This bankruptcy case was filed for the improper strategic purpose of attempting to delay and hinder discovery and trial in this ongoing litigation in multiple forums.

For the last 7 years, the Debtors and their Members have been trying, without success, to fend off litigation accusing them and their affiliates of fraud and misrepresentation, among other things, and seeking to recover damages in excess of $400 million.[3]  To stop the litigation before discovery, the Members needed the Debtors to file this bankruptcy since they cannot do it on their own, and the Members' best interest is to see these cases stay in Chapter 11 to stay the litigation that they have been unable to do for seven years.  This is the reason why the Members are willing to fund

---

[1] *See Reporter's Transcript of 341 Meeting of Creditors taken August 21, 2015* (the "341(a) Transcript") at 28:16-22, which is attached as attached as Exhibit 1 to the Official Committee of Unsecured Creditors' Request for Judicial Notice filed at Docket No. 189;  *see also* Statement of Financial Affairs [Docket Nos. Nos. 77, 79, and 80].

[2] 341(a) Transcript at 38:15-22; 138:2-24; 152:19 – 154:8.

[3] *See* Docket No. 194 at Ex. 164 (*Second Amended Consolidated Complaint* filed in District Court, Clark County Nevada Case No. A547024).

10805167.1/037967.0002

1    this bankruptcy. It is the Members that are the real parties in interest in these cases as only the

2    Members have assets of value to protect, unlike the Debtors, who have no operations and barely any

3    assets.[4]

4        Notbly, the Debtors' manager has admitted that the bankruptcy was filed to "address" the

5    pending litigation claims: "The Debtors' ongoing operations are limited to addressing the pending

6    litigations and arbitrations and various remaining issues from the development of The Signature

7    Towers." [5]    There is absolutely no basis, however, for these Debtors, who have no business

8    operations, no operating income, no employees (other than a manager hired on the eve of

9    bankruptcy), and no assets to protect, to use chapter 11 to "address and resolve legitimate claims,"

10   particularly when the lions' share of those claims are aimed at non-debtor insider Affiliates.[6]

11       Moreover, the Debtors have asserted that many, if not the majority, of the third-party

12   litigation claims are "property of the estate" that the Debtors control.[7] This is troubling, as there is

13   no evidence that the claims can or will be pursued by the Debtors. In fact, the Debtors agreed that

14   they would not bring suits against the Affiliates or else a default would be triggered under the

15   proposed DIP loan agreement.[8]    Even if the Debtors could bring such suits, the Debtors are

16   inherently conflicted from asserting any claims against their Members or Affiliates. Instead, the

17   Debtors are "in the process of investigating the litigation claims" and have been afforded a budget to

18   do so of $50,000 by the very targets of the investigation.[9]    It defies belief that the Debtors would

19   only now be "investigating" claims asserted in litigation against the Affiliates when such claims

---

[4] In fact, the Debtors are not even parties to the State Court litigation that the Debtors removed to the Bankruptcy Court. *See* Docket No. 94.

[5] *Declaration of Dr. Kenneth W. Wiles in Support of the Debtors' Motion for an Order:(I) Authorizing Post-Petition Financing, (II) Granting Liens and Providing Superpriority Administrative Expense Claims, (III) Approving Loan Documents Related to the Foregoing; (iv) Granting Relief from the Automatic Stay, and (v) Granting Other Related Relief* (the "Wiles Declaration") ¶ 13 [Docket No. 96]. *See also* 341(a) Transcript at 57:11-23.

[6] Wiles Declaration at ¶¶ 15, 16; *see also* 341(a) Transcript at 130:7-12 (no income from operations); 130:21-25 – 134:1 ("business operations" discussion).

[7] *See also* 341(a) Transcript at 23:10-25 and 24:1-3.

[8] *See* Docket No. 95-1 at p. 22 (DIP Agrmt. at § 7(i)(iv)).
[9] *See* Docket No. 95-2 at p. 9 (proposed DIP Order at ¶ 4.a); *see also* 341(a) Transcript at 58:3-9.

3

1  have been known to them and been pending for over eight years and for which the Debtors and

2  Affiliates have spent millions of dollars defending against.

3      This bankruptcy is a classic attempt to gain litigation leverage over the only real creditors in

4  these cases who are the original purchasers.  Where there is nothing to reorganize, no business

5  operations, no assets to protect, and no real interest in the prepetition litigation claims other than to

6  shield the assets of the Members and their parent MGM and Turnberry affiliates (the "Affiliates"),

7  these cases should not remain in bankruptcy and should be dismissed.  In the alternative, conversion

8  of these cases to chapter 7 is appropriate.

9                          **STATEMENT OF FACTS**

10      The claims comprising the litigation that the debtors are currently subject to arose more than

11  eight years ago. The litigants in these ongoing actions are the only persons who have filed claims in

12  court within the statute of limitations. These litigants consist of approximately 540 persons who

13  were original purchasers of approximately 500 units.

14      This bankruptcy filing is nothing more than a strategic litigation filing being made to find a

15  fourth forum that will again hear the defendants motion to dismiss for a fourth time. The first three

16  motions to dismiss have already been denied (i) by Judge Denton in Nevada State Court hearing the

17  claims against the defendants other than the debtors where a jury trial is being sought, (ii) by

18  Arbitrator Hare hearing the federal claims against all defendants, and (iii) by Arbitrator Sofaer

19  hearing the claims against only the Debtor, Turnberry/MGM Grand Towers, LLC. Discovery that

20  has now been ordered in all three forums which defendants have been trying to avoid at all costs.[10]

21      The substance of these state and federal proceedings is to seek a return of the ill-gotten gains

22  and damages from the principals, MGM Resorts and MGM Grand Hotel. State law issues

23  predominate over any perceived bankruptcy issues.  The substance of the proceedings now being

24  prosecuted in other proceedings are directed against the principals and not the Debtors.  Indeed, none

25  of the Debtors are even parties to the Nevada state court proceedings. Therefore,

26

27  [10] See Orders of Judge Denton, Arbitrator Hare and Arbitrator Sofaer, attached to the Declaration of
    Norman Blumenthal ("Blum Dec") as Exhibit 1.  Notably, Debtors Turnberry/MGM Grand Towers

28  B, LLC and Turnberry/MGM Grand Towers  C, LLC are not named as defendants in any of the
    actions.

                                    4

10805167.1/037967.0002

1   Plaintiffs in these actions will be severely prejudiced by this court interfering with the ongoing

2   litigation as Plaintiffs therein are on the verge of obtaining discovery that defendants have avoided

3   producing for the last 8 years through forum shopping.

4       The Debtors are and always has been nothing more than empty shells formed as pass

5   throughs for the funds that built the Signature at MGM Grand and the profits derived therefrom.  The

6   debtors never had any assets, employees or offices of its own. The assets were supplied by MGM

7   Resorts International and Turnberry Associates.  The offices and employees were supplied by MGM

8   Grand Hotel LLC and Turnberry West Realty, Inc. The $420 million in net profits was removed by

9   MGM Resorts International and Turnberry Associates from the Debtors in 2006 and 2007 and the

10  Debtors have been out of business as empty shells for the last 8 years. See MGM 10-k excerpt

11  attached to Blum Dec as <u>Exhibit 2</u>.

12      Claims in these other actions were originally filed starting in 2007.  Plaintiffs are seeking

13  damages from the principal perpetrators of the scheme to defraud, MGM Resorts International and

14  MGM Grand Hotel, LLC.  The Debtors and the other shell companies used by the principals to pass

15  through funds and property were mere pawns in this scheme to defraud and are not essential to the

16  prosecution of the core claims against the principals now being prosecuted in state court and federal

17  arbitration.  Notably, the debtors are not even parties to the state court proceedings and are  being

18  sued in a separate arbitration.

19      The bait and switch scheme to defraud was to advertise the hotel condominium suites for

20  preconstruction sale as "luxury" rental units for upscale users with represented rental rates equal to

21  the rates of suites at the Bellagio and Four Seasons, while at the same time secretly planning to

22   rent the units as "economy" rental units as "accommodations" for patrons of the "Wet Republic"

23  day pool that was secretly being planned to be built on the common areas of the Signature property.

24  See Declaration of Anthony Olheiser, along with April 24, 2008 Las Vegas Review Journal article,

25  Declaration of Nelli Oberti, and excerpts of the testimony of Jeffrey Schoor, attached to Blum Dec

26  as <u>Exhibits 3, 4 and 5</u>.  There was no way for any Plaintiff to know of these secret plans and

27  concealed fraud, known only to the insiders, until after their purchases closed, the "Wet Republic"

28

5

opened in 2008, and the units were advertised by MGM at economy rental rates. See advertisements attached to Blum Dec as <u>Exhibit 6.</u>

The clientele of the "Wet Republic" is a young, hard-drinking, raucous crowd seeking a "spring break" atmosphere consisting of lots of booze and DJ music so loud that the decibel levels exceed the Clark County noise ordinance by 8 fold and cause unit floors to vibrate and windows to rattle.

As a result of this bait and switch scheme to defraud of selling luxury rentals and delivering economy rentals orchestrated by MGM Resorts and implemented by MGM Grand Hotel, the value of Plaintiffs' property plunged by 75% virtually overnight and has never recovered. These facts will therefore prove that Plaintiffs' losses have everything to do with the MGM Resort and MGM Grand Hotel's specific scheme to defraud them in the sale and use of these Signature at MGM Grand units and nothing to do with general market trends. Notably, while other property values in Las Vegas have recovered some of their value, the value of the Signature units remains at these same low levels, as low income producing properties. The cash flow chart of Plaintiffs Raul and Fermine Rios proves the revenue split for their unit after paying all of MGM's hidden charges over the last seven years is 92% to 8% in favor of MGM, before the Rios pay their mortgage, property taxes and insurance. See Rios Chart, attached to Blum Dec as <u>Exhibit 7.</u>[11]

These were the perfect units for MGM Grand to use to as "accommodations" for MGM Grand's "economy" clientele because MGM Grand was not the owner of these units and had no carrying costs of these units. As a result, these original purchasers, as the victims of this scheme to defraud, had to shoulder the burden of these uncontrolled costs and reduced room rates lost their units through short sales or foreclosures. At the same time MGM Resorts and MGM Grand Hotel have made hundreds of millions of dollars through the fraudulent sales scheme and the operations of the "Wet Republic" which unlike other day pools has "luxury" condominium suites at their front door available at "economy" rates.

---

[11] The revenue split promised by MGM as part of the sales scheme was 54/46 in favor of the purchaser after deducting for incidental expenses. See sales promotion material attached to Blum Dec as <u>Exhibit 8.</u>

10805167.1/037967.0002

# ARGUMENT[12]

This Court is authorized to dismiss or convert these cases in accordance with section 1112(b) of the Bankruptcy Code for cause or to dismiss these cases without cause in accordance with section 305(a)(1) of the Bankruptcy Code.  Because these cases are admittedly brought to deal with the litigation claims, these Debtors have no operations or income, and the overwhelming creditor constituency are current or former Signature unit owners with litigation claims that have been pending in nonbankruptcy forums for seven or eight years primarily against non-debtor parties, an immediate dismissal of these cases is in the best interests of these estates.

## I.    These Cases Should Be Dismissed for Cause

Pursuant to section 1112(b) of the Bankruptcy Code, a court shall convert a chapter 11 case to a chapter 7 case for cause on request of a party in interest and after notice and a hearing. 11 U.S.C. § 1112(b); *see also In re Rubenstein*, 71 B.R. 777, 778 (BAP 9th Cir. 1987).  Section 1112(b) of the Bankruptcy Code provides in pertinent part that:

> (b) (1) Except as provided in paragraph (2) of this subsection, subsection (c) of this section, and section 1104(a)(3), on request of a party in interest, and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court ***shall*** convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.
>
> (2) The relief provided in paragraph (1) shall not be granted absent unusual circumstances specifically identified by the court that establish that such relief is not in the best interests of creditors and the estate, if the debtor or another party in interest objects and establishes that—
>
>   (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and
>
>   (B) the grounds for granting such relief include an act or omission of the debtor other than under paragraph (4)(A)—

---

[12] To give credit where credit is due, significant portions of the legal argument contained herein have been lifted directly from the Motion By The Official Committee of Unsecured Creditors For an Order Dismissing Cases or, In the Alternative, Converting Cases To Chapter 7, filed on August 28, 2015, Doc. No. 195.  Plaintiffs appreciate the fine work product of Committee counsel, and thus incorporated it herein.

10805167.1/037967.0002

1

(i) for which there exists a reasonable justification for the act or omission; and

2

3

(ii) that will be cured within a reasonable period of time fixed by the court.

4

11 U.S.C. § 1112(b) (2006) (emphasis added).

5

6

**A.      Inability to Effectuate a Plan Is a Basis for Dismissal Under Section 1112(b)(2) of the Bankruptcy Code**

7

Under section 1112(b)(2), the "inability to effectuate a plan" is cause to warrant dismissal or

8

9

conversion.  Courts consistently view the hope of litigation recoveries as an insufficient basis to

10

defeat a showing of cause to dismiss or convert a chapter 11 case.  *See In re FRGR Managing Member LLC*, 419 B.R. 576, 582-83 (Bankr. S.D.N.Y. 2009) ("[M]ost cases reject the need to

11

evaluate the merits of a debtor's litigation claims in deciding whether to dismiss or convert a chapter

12

13

11 case."); *In re BH S & B Holdings, LLC*, 439 B.R. 342, 350-51 (Bankr. S.D.N.Y. 2010) ("Second,

14

case law is clear that the mere hope of prevailing on potential litigation claims is not a sufficient

15

basis to defeat a showing of cause to convert."); *In re Edwards*, 1996 WL 407253, at *4-5 (Bankr.

16

E.D. Pa. June 17, 1996) (examining decisions from across the country and noting that in the face of

17

"long and hotly contested" litigation, there was ""no reasonable possibility of a successful

18

reorganization within a reasonable period of time'") (quoting *United Sav. Ass'n v. Timbers of Inwood Forest Assoc.,* 108 S. Ct. 626, 633 (1988)).

19

20

> In general, courts look to what capital and other actual assets a debtor possesses which can be used in his Plan of Reorganization, however, potential recovery from a law suit is insufficient to create a reasonable likelihood of rehabilitation. *In the Matter of Imperial Heights Apts.*, Ltd., 18 B.R. 858 (Bkrtcy.S.D.Ohio 1982).  Since there is no way to establish the feasibility of a plan which is to be funded solely from the possibility of a lawsuit, bankruptcy courts will convert or dismiss such Chapter 11 cases. *In the Matter of Winshall Settlor's Trust*, 758 F.2d 1136 (6th Cir.1985). Some Courts have stated that a mere potential law suit is insufficient to even invoke Chapter 11 jurisdiction if the debtor has no business to reorganize. *In re: 312 West 91st Street Company*, 35 B.R. 346 (Bkrtcy.S.D.N.Y.1983).

21

22

23

24

25

26

27

*Thompson v. Kramer (In Thompson),* 1995 WL 358135, at *3 (E.D. Pa. June 9, 1995) (citations

28

omitted (quoting *Moody v. Security Pacific Bus. Credit Inc.*, 85 B.R. 319, 345 (W.D. Pa.1988),

8

1    *vacated on other grounds*, 858 F.2d 137 (3d Cir.1988)).

2    In *In re FRGR Managing Member LLC*, the Court granted the U.S. Trustee's motion to

3    convert or dismiss the case on facts similar to those similar here.  Like in these cases, it was

4    undisputed that "the Debtor had no operating assets or business."  419 B.R. at 585.  Like here,

5    "Debtor's monthly operating reports for June, July and August 2009 reflect that Debtor had

6    aggregate receipts of $0 and aggregate disbursements of $0." *Id.* at 578.  And like these cases, the

7    "Debtor's sole asset currently consists of 'Claims arising from ownership of [First Republic Realty],'

8    which claims have 'Unliquidated Value.'" *Id.*  Further, the *FRGR* court found that the litigation

9    claims were part of a larger dispute between the debtor's principal and the secured lender and were

10    being conducted for the benefit of the debtor's principal. *Id.* at 583.  On these facts, the court

11    converted the chapter 11 to chapter 7. *Id.*

12    Similarly, in *In re Ameribuild Constr. Mgmt.*, the chapter 11 was filed amidst contentious

13    litigation between the debtor's owner (Roth) and an employee (Schumer).  As the Court succinctly

14    put it:  "The material fact bearing on the motion to convert, however, is not whether Roth or

15    Schumer is responsible for the Debtor's demise, but that the Debtor's demise is an uncontested fact.

16    It has no employees, no income, and no business, and not even a bank account." 399 B.R. 129, 132

17    (Bankr. S.D.N.Y. 2009) (motion to convert granted); *see also Roma Group, Inc. v. Office of the U.S.

18    Trustee (In re Roma Group, Inc).*, 165 B.R. 779, 780–81 (S.D.N.Y.1994) (dismissing case where

19    "debtors had no property, no businesses, no employees and no assets other than the causes of action

20    asserted in their adversary proceeding"); *In re Golden Ocala Partnership*, 50 B.R. 552 (Bankr. M.D.

21    Fla. 1985) (dismissing chapter 11 petition and attendant adversary proceeding where debtor's only

22    asset was potential claim for fraudulent conveyance).

23    Here, the Debtors filed these cases with $26,882 of cash on hand as of the Petition Date.  For

24    the past two years, the Debtors have had no income from operations as evidenced by their Statement

25    of Financial Affairs.[13]  While in bankruptcy, they have had no income, receipts, or disbursements for

26    the first two months of these cases (except a de minimis $98 disbursement made in July) as

27

28    [13] *See* Docket Nos. 77, 79, and 80 (Statement of Financial Affairs, Question 1, Answer:  "None").

9

evidenced by their monthly operating reports.[14]  Nor do they project any income in the forseeable

future as evidenced by their projected thirteen-week cashflow forecast attached to the DIP Motion.[15]

Although they have restricted cash of $1.5 million in three Bank of America accounts, they cannot

access such cash because those funds are in restricted certificate of deposit accounts that secure

various letters of credit issued by Bank of America.[16]  The Debtors' primary assets are contingent

derivative litigation claims against the Members and Affiliates that apparently need to be

investigated on behalf of the Debtors' estates, although their existence has been known for eight

years by the Debtors, and then pursued against the Members and Affiliates.  And as noted above,

courts consistently hold that potential litigation claims held by debtors is an insufficient basis to

defeat a motion to dismiss or convert a case under section 1121(b)(2) of the Bankruptcy Code.

There is no need to examine the merits of the underlying potential claims against the Members and

Affiliates.  The sole fact that these are the Debtors' primary assets around which the Debtors propose

to proceed with these cases is evidence enough for dismissal.  On these facts, these cases must be

dismissed.

**B.      Diminution of the Estates and the Absence of a Reasonable Likelihood of Rehabilitation**

Under section 1112(b), conversion or dismissal is *mandatory* upon a finding of "cause."  *See*

11 U.S.C. § 1112(b)(1) (use of the word "shall" instead of "may").  A list of factors that constitute

"cause" for dismissal is set forth under section 1112(b)(4).  Cause exists to dismiss these bankruptcy

cases also because there is a "substantial or continuing loss to or diminution of the estate and the

absence of a reasonable likelihood of rehabilitation."  11 U.S.C. § 1112(b)(2)(B)(4)(A); *Johnston v.*

*Gem Dev. Co, (In re Johnston)* 149 B.R. 158, 162 (BAP 9th Cir. 1992); *In re Citi-Toledo Partners*,

170 B.R. 602, 606 (Bankr. N.D. Ohio 1994).  Where the position of creditors is continuing to erode

and creditors are not likely to be satisfied if the case remained in chapter 11, sufficient grounds for

conversion exist.  *See In re Johnston*, 149 B.R. at 162; *see also Rosenberg Real Estate Equity Fund*

---

[14] *See* Docket Nos. 151 and 152.

[15] *See* DIP Motion, Budget, Docket No. 95-1 at p. 37.

[16] *See* Cash Management Motion, Docket No. 88 at ¶ 17.

1    *v. Air Beds, Inc. (In re Air Beds, Inc.)*, 92 B.R. 419, 424 (BAP 9th Cir. 1988); *Fossum v. Federal*

2    *Land Bank* (*In re Fossum*), 764 F.2d 520, 521-22 (8th Cir. 1985).

3    Diminution of an estate exists where, for example, the debtor's business has ceased or the

4    debtor's liabilities outstrip its assets. *Citi-Toledo Partners*, 170 B.R. at 606; *In re CCN Realty*

5    *Corp.*, 23 B.R. 261, 262 (Bankr. S.D.N.Y. 1982). Courts may find that there has been a diminution

6    of the estate where it is shown that "'the estate is suffering some diminution in value.'" *Toledo*

7    *Partners*, 170 B.R. at 606 (quoting *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1988)).

8    A debtor lacks "a reasonable likelihood of rehabilitation" where, for example, it lacks

9    income, operating funds, employees, or "continuing revenue-generating activity." *See id.* at 606-07,

10    609; *see also In re Johnston*, 149 B.R. at 162 (debtor lacked income); *In re Great American Pyramid*

11    *Joint Venture*, 144 B.R. 780, 791 (Bankr. W.D. Tenn. 1992) (debtor lacked operating funds).

12    Moreover, the fact that a liquidating plan could conceivably be proffered should not result in a

13    finding that "a reasonable likelihood of rehabilitation" exists. "Although the Bankruptcy Code

14    contemplates liquidating plans of reorganization in certain circumstances, the Court cannot equate

15    the determination of whether [the debtor] possesses a reasonable likelihood of rehabilitation with

16    [the debtor's] ability to effectuate a liquidating plan." *Citi-Toledo Partners*, 170 B.R. at 607. A

17    debtor's inability to effectuate a plan and the resulting detriment to creditors constitutes cause to

18    convert a case to a chapter 7. *Koerner*, 800 F.2d at 1368. Where a court finds "no reasonable

19    possibility of reorganization," it need not delay conversion. *Johnston*, 149 B.R. at 162.[17]

20    There is no business here and no material assets to preserve. The Debtors have only $26,882

21    of cash on hand and contingent claims in unknown amounts as set forth above and no income from

22    operations. Against these assets, the Debtors propose to borrow $2 million from their insider parents

23    who are also co-defendants in the prepetition litigation, to fund the administrative costs of these

24    bankruptcies. The math simply does not add up. No rational debtor would borrow millions of

---

25    [17] Where there is no reasonable possibility of an effective reorganization, the bankruptcy court is not
26    compelled to wait a certain period of time, to the detriment of creditors, before ordering conversion
    of the case. *See Stage I Land Co. v. H.U.D.*, 71 B.R. 225, 231 (D. Minn. 1986) (chapter 11 case
27    should be dismissed at the outset for cause where no reasonable possibility of a reorganization
    exists); *In re Economy Cab & Tool Co.*, 44 B.R. 721, 724 (Bankr. D. Minn. 1984) (chapter 11 case
28    may be converted in early stages of proceeding where movant can show that there is "no more than a
    'hopeless and unrealistic prospect' of rehabilitation").

dollars to protect the Debtors' current assets on hand nor would any parent lend funds into the Debtors who have no income. The Members can have no reasonable expectation of repayment under such circumstances, except for undue litigation leverage. There is no legitimate purpose being served in these cases and reorganization around a hope that a settlement may occur sometime in the future is not a basis for these cases to remain in Chapter 11.

**C.    Bad Faith Filing Constitutes Cause for Dismissal Under Section 1112(b)(1) of the Bankruptcy Code**

Lack of good faith in filing a chapter 11 petition establishes cause for dismissal. 11 U.S.C. § 1112(b); *Marsch v. Marsch (In re Marsch), 36 F.3d 825, 828 (9th Cir. 1994)*. In the context of filing a petition, "good faith" is a term of art. "Though it suggests that the debtor's subjective intent is determinative, this is not the case. Instead, the 'good faith' filing requirement . . . [is intended] to deter filings that seek to achieve objectives outside the legitimate scope of the bankruptcy laws." *Id*. "[T]he test is whether a debtor is attempting to unreasonably deter or harass creditors or attempting to effect a speedy, efficient reorganization on a feasible basis." *Id*. (citing *In re Arnold*, 806 F.2d 937, 939 (9th Cir. 1986). "The purpose of the good faith requirement is to ensure that the hardships imposed on creditors are justified by fulfillment of statutory objectives." *In re Liberate Technologies*, 314 B.R. 206, 211 (Bankr. N.D. Cal. 2004).

> It is easy to see why courts have required Chapter 11 petitioners to act within the scope of the bankruptcy laws to further a valid reorganizational purpose. Chapter 11 vests petitioners with considerable powers—the automatic stay, the exclusive right to propose a reorganization plan, the discharge of debts, etc.—that can impose significant hardship on particular creditors. When financially troubled petitioners seek a chance to remain in business, the exercise of those powers is justified. But this is not so when a petitioner's aims lie outside those of the Bankruptcy Code.

*Id*. (quoting *In re SGL Carbon Corp*., 200 F.3d 154, 165-66 (3d Cir. 1999)).

Whether a petition is filed in good faith is to be determined upon consideration of all the facts and circumstances of the case. *Platinum Capital, Inc. v. Sylmar Plaza, L.P. (In re Sylmar Plaza, L.P.),* 314 F.3d 1070, 1075 (9th Cir. 2002; *In re Marsch*, 36 F.3d at 828. Once the issue is raised, it is the debtor's burden to prove that its petition was filed in good faith. *Leavitt v. Soto (In re Leavitt)*, 209 B.R. 935, 940 (BAP 9th Cir. 1997), *aff'd*, 171 F.3d 1219 (9th Cir. 1999); *SGL Carbon*

12

10805167.1/037967.0002

*Corp.*, 200 F.3d at 162 n.10. Under the facts of this Case, the Debtors manifestly cannot carry that burden, and the Court should find good faith to be lacking.

To determine whether a debtor has filed a petition in bad faith, courts within the Ninth Circuit typically weigh a variety of circumstantial factors such as whether:

> (1) the debtor has only one asset; (2) the debtor has an ongoing business to reorganize; (3) there are any unsecured creditors; (4) the debtor has any cash flow or sources of income to sustain a plan of reorganization or to make adequate protection payments; and (5) the case is essentially a two party dispute capable of prompt adjudication in state court.

*St. Paul Self Storage LP v. Port Authority (In re St. Paul Self Storage LP)*, 185 B.R. 580, 582-83 (BAP 9th Cir. 1995) (citing *In re Stolrow's Inc.*, 84 B.R. 167 (BAP 9th Cir. 1988)); *see also Leavitt*, 209 B.R. at 940 ("[B]ad faith exists where the debtor filed a petition only with the intention to defeat state court litigation.")).

There is no other precipitating emergency for these filings except the plaintiffs' allegations that these cases were filed to thwart discovery and the Debtors' argument that they had finally had enough of pending litigation. These Debtors have no business to reorganize and no prospects for a reorganization absent a cash infusion from the Members. The Debtors' game plan is apparent as they have already sought to remove the pending state court litigation to these cases and the Debtors are not even parties to the state court litigation that they have attempted to remove.[18] Additionally, as evident from the bar-date motion and the proposed retention of the Morris Law Group, the Debtors propose to drive the nonbankruptcy litigation through these bankruptcy cases through the "claims litigation protocol" and proposed specialized bar date form.[19]

The factors in judging whether a business filed for bankruptcy reorganization in good faith also militate toward a finding of lack of good faith here. As set forth above, all unsecured creditors listed in the Debtor's Schedule F, except four *de minimis* creditors, are current or former unit owners. Thus, the primary creditors in these cases are unsecured creditors. This case is a dispute with the homeowners on one side and the Debtors and the Affiliates on the other, which is more properly resolved in the non-bankruptcy forum under which these disputes were already pending.

---

[18] *See* Docket No. 94.

[19] See generally Docket No. 86 (bar date motion) and Docket No. 90 at ¶ 30 (Morris Law Group retention application).

13

10805167.1/037967.0002

1    *In re Silberkraus*, 253 B.R. 890, 906 (Bankr. C.D. Cal. 2000), *aff'd*, 336 F.3d 864 (9th Cir. 2003).

2    Because these fall squarely within the textbook examples of bad-faith cases, the Court should

3    dismiss the cases for cause under section 1112(b)(1) of the Bankruptcy Code.

4           Bankruptcy courts are courts of equity and debtors with unclean hands are not allowed to

5    benefit from bankruptcy filings. See e.g., *Little Creek Dev. Co. v. Commonwealth Mtg. Corp.*, 779

6    F.2d 1068, 1072 (5th Cir.1986) ("The good faith requirement imposed on all debtors seeking the

7    protection of the bankruptcy courts prevents abuse of the bankruptcy process and safeguards the

8    integrity of the courts by only permitting those with clean hands to avail themselves of the

9    Bankruptcy Code's 'powerful equitable weapons.'"); *In re Mack*,  347 B.R. 91, 9151 (Bankr.  M.D.

10   Fla. 2006).

11          From the first filing of the first complaint in Nevada State Court on August 27, 2007, the

12   litigation strategy of the defendants was and currently is to avoid discovery at all costs.  Currently

13   faced with (1) the denial of their Motion to Dismiss in the *Sussex* arbitration; (2) denial of their

14   motions to dismiss in the *KJH* State arbitration before Arbitrator Sofaer; (3)  denial of their motions

15   to dismiss in the *KJH* State Court; and (4) the imminent opening of discovery in all three of these

16   proceedings, defendants unleashed their last line of defense to discovery, the bankruptcy of the

17   Debtors.

18          Notably the bankruptcy filing has all the indicia of a bad faith filing.  The Debtor have no

19   assets, the Debtors have only one group of active creditors who are the Plaintiffs in the ongoing

20   lawsuits, the Debtors have no ongoing business or employees, the funds in dispute are no longer the

21   property of the debtors, and the Debtors' financial problems involve essentially a dispute between

22   the Plaintiffs and the principals in the scheme to defraud in which the Debtors are nothing more than

23   an agent of the principals.  Clearly, the timing of the filing evidences an intent to delay and frustrate

24   the ongoing litigation against the principals who orchestrated the bait and switch scheme to defraud

25   and who received the ill-gotten gains.

26          Here, after seven (7) years of litigation and arbitration, discovery had finally been ordered to

27   proceed in the *KJH* State Action and the *KJH* and *Sussex* arbitrations.  The sole purposes of this

28   bankruptcy filing are to stop the ongoing arbitrations and state court action and to shop for a new

14

forum to re-litigate issues decided against the defendants.  This case is strikingly similar to *In re Ebell Media, Inc.*, 462 Fed.Appx. 674, 2011 WL 6322527 (9th Cir. 2011) where Ninth Circuit affirmed a bankruptcy court order lifting the stay and permitting a pre-petition arbitration against a debtor to proceed, where the admitted purpose of the bankruptcy was to stop the arbitration and the debtors had no assets to be administered:

> **Given the timing of the petition, its delay of the arbitration proceeding, and the absence of any estate to be administered, there can be no doubt that the petition was filed in bad faith.** See *St. Paul Self Storage Ltd. P'ship v. Port Authority of the City of St. Paul (In re St. Paul Self Storage Ltd. P'ship)*, 185 B.R. 580, 584 (9th Cir. BAP 1995) (finding bad faith under similar facts). **The bankruptcy court did not abuse its discretion in terminating the stay to permit the pre-petition arbitration proceeding to go forward.**

*Id.* at 676. (emphasis added)

The bankruptcy filing is a transparent attempt by the principals of fraudulent scheme, who own the debtors, to abuse the jurisdiction of this court in an attempt to eliminate Plaintiffs' individual claims of fraud and their right to a jury trial against the Non-Debtors.

## II.    Dismissal Is Also Appropriate Under Section 305(a)(1) of the Bankruptcy Code

Section 305(a)(1) of the Bankruptcy Code provides that "The court, after notice and a hearing, may dismiss a case under this title . . . at any time if – (1) the interests of creditors and the debtor would be better served by such dismissal . . ." 11 U.S.C. § 305(a)(1). No "cause" is required to be shown for a case to be dismissed under section 305(a)(1).

Although the applicable factors vary from case to case, courts in the Ninth Circuit generally look to:  (i) whether there is a pending proceeding in an alternative forum; (ii) whether the debtor's disputes could be more efficiently resolved in an alternative forum; and (iii) whether the bankruptcy case was filed for a proper purpose. *See, e.g.*, *In re Malek & Chahayed Chiropractic Corp.*, 2009 Bankr. LEXIS 4511, at *8 (Bankr. C.D. Cal. Nov. 16, 2009) ("Courts applying §305(a)(1) look to: whether a state court receivership has proceeded so far that it would be duplicative to proceed in a bankruptcy case, whether a case was filed for a proper purpose and any other factors relevant to the particular situation at issue."); *In re Fax Station, Inc.*, 118 B.R. 176, 178 (Bankr. D.R.I. 1990) ("factors [for dismissal under section 305(a)(1)] generally include (1) economy and efficiency of

administration; (2) whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court; (3) whether federal proceedings are necessary to reach a just and equitable solution; (4) whether there is an alternative means of achieving the equitable distribution of assets; (5) whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case; (6) whether a non-federal insolvency has proceeded so far that it would be costly and time-consuming to start afresh with the federal bankruptcy process; and (7) the purpose for which bankruptcy jurisdiction has been sought); *In re Paper I Partners, L.P.*, 283 B.R. 661, 679 (Bankr. E.D.N.Y. 2002) (same).   Applying these factors, the cases should be dismissed under section 305(a)(1).

A.    **Pending Proceedings in Alternative Forum**

A pending proceeding in an alternative forum weighs in favor of dismissal under section 305(a)(1). *See, e.g., Wechsler v. Macke Int'l Trade (In re Macke Int'l Trade)*, 370 B.R. 236. 247 (BAP 9th Cir. 2007)("Typical circumstances for dismissing under § 305(a)(1) include the pendency of proceedings such as assignments for the benefit of creditors, state court receiverships, or bulk sale agreements.") (citations omitted).   Here, the litigation disputes between the parties have been pending for several years in other nonbankruptcy jurisdictions.  The claims comprising the litigation that the Non-Debtors are currently subject to arose more than 8 years ago.  The litigants in these ongoing actions are the only persons who have filed claims in court within the statute of limitations.  These litigants consist of approximately 540 persons who were original purchasers of approximately 500 units.  The *KJH* State Action was originally filed starting in 2007 seeking damages from the principal perpetrators of the scheme to defraud.  The Debtors and the other shell companies used by the principals to pass through funds and property were mere pawns in this scheme to defraud and are not essential to the prosecution of the  claims against the principals now being prosecuted in state court and federal arbitration.

Motions to dismiss have already been denied (i) by Judge Denton in Nevada state court hearing the claims against the defendants other than the Debtors where a jury trial is being sought, (ii) by Arbitrator Hare hearing the federal claims against all defendants, and (iii) by Arbitrator Sofaer

16

hearing the claims against only the Debtor, Turnberry/MGM Grand Towers, LLC.  Discovery has now been ordered in all three forums. Thus, this factor weighs in favor of dismissal.

**B.      Efficient Resolution in Nonbankruptcy Forums**

Courts have recognized that where, as here, a case can be efficiently resolved in nonbankruptcy forums, a competing bankruptcy proceeding is unnecessary because it will generally result in duplicative efforts. *See Malek & Chahayed Chiropractic Corp.*, 2009 Bankr. LEXIS 4511, at *1-3, *36-41 (dismissing voluntary case as "as clear a case of duplicative effort as this Court can imagine" where receiver was already working to resolve debtor's liabilities and concerns over motives and competence of management would likely necessitate appointment of a bankruptcy trustee); *In re Iowa Trust*, 135 B.R. 615, 624 (Bankr. N.D. Iowa 1992) (dismissing voluntary bankruptcy case because it would "add unnecessary cost and duplication of efforts already under way" in state court proceeding).  A bankruptcy proceeding will add no efficiencies.

Judge Denton and Arbitrator Hare each have had years of experience presiding over the claims in these cases.  Therefore , transferring these cases to bankruptcy court at this late date would be detrimental to the efficient use of judicial resources.  See *Boyd v. GMAC Mortg.* LLC, 2012 WL 1424992, *2 (N.D.  Cal. April 24, 2012).

Further, arbitration applies to certain pending lawsuits.   In non-core proceedings like these, the bankruptcy court does not have discretion to deny enforcement of a valid prepetition arbitration agreement.  *In re Thorpe Insulation Co.*, 671 F.3d 1011, 1020-21 (9th Cir. 2012).  As the Ninth Circuit Bankruptcy Appeal Panel held  in  *In re  Mor-Ben Insurance Markets Corp.*, 73 B.R. 644 (B.A.P. 9th Cir.1987),  non-core claims that are subject to an arbitration agreement to which a debtor is a party must continue to be litigated in arbitration.  The court held that "[a]bsent a Congressional mandate to preclude arbitration in the bankruptcy context, or a compelling situation seriously affecting the rights of creditors in a bankruptcy," the parties should be held to their agreement to arbitrate. *Id.* at 649.  Moreover,  several of the claims asserted require a jury trial for resolution so they cannot be heard before this Court in any event.  The real targets are the Members and Affiliates and claims against such parties have already been brought and are pending in nonbankruptcy forums.

///

17

C.    **The Petition Was Filed for an Improper Purpose**

Dismissal of a case is appropriate where the petition was filed for an improper purpose, such as delay tactics or forum shopping.  *In re Malek and Chahayed Chiropractic Corp.*, 2006 Bankr. LEXIS 4511, at *41 (dismissing voluntary chapter 7 case where there were strong indications . . . of forum shopping and delay tactics that should not be permitted"); *In re First Fin. Enters., Inc.*, 99 B.R. 751, 754 (Bankr. W.D. Tex. 1989) (holding that dismissal is proper "in a case in which an attempt is made to circumvent the Bankruptcy Code by doing indirectly what cannot be done directly, such as . . . the use of a Chapter 11 case purely as a litigation strategy"); *see also Macke Int'l Trade,* 370 B.R. at 247 (finding allegations that creditor filed involuntary chapter 11 petition to gain strategic advantage in state court litigation to be "significant[]" in affirming dismissal of chapter 11 case under section 305(a)(1)).

As set forth above, given the Debtors' lack of assets other than potential derivative litigation claims against the Affiliates, these cases were filed for an improper purpose of gaining undue litigation leverage.  Permitting these to proceed in bankruptcy would facilitate the type of delay that courts have consistently condemned in granting dismissal under section 305(a)(1).  Accordingly, these cases should be dismissed under section 305(a)(1).

Here, after seven (7) years of litigation and arbitration, discovery had finally been ordered to proceed in the *KJH* State Action and the *KJH* and *Sussex* arbitrations.  The sole purposes of this bankruptcy filing are to stop the ongoing arbitrations and state court action and to shop for a new forum to re-litigate issues decided against the Defendants, including motions to dismiss that have been denied in all three forums.

III.    **In the Alternative, Conversion to Chapter 7 Is in the Best Interests of Creditors**

Given the Debtors' inability to confirm a plan or, for that matter, fund administrative costs without borrowings from their insider Members on onerous terms, the Debtors are likely administratively insolvent and conversion to chapter 7 is much more likely to serve creditor interests than allowing these cases to proceed in chapter 11.  Conversion to chapter 7 will provide an independent fiduciary in the chapter 7 trustee who is charged with investigating claims against the Affiliates promptly and in a manner designed to maximize values for the benefit of the estates.

18

10805167.1/037967.0002

## **CONCLUSION**

For all the foregoing reasons, Plaintiffs respectfully request that the Court enter an order (a) immediately dismissing these cases, or, in the alternative; (b) converting the case to one under chapter 7 of the Bankruptcy Code; and (c) granting such other and further relief as the Court deems just and proper.

DATED this 4th day of September 2015.

FENNEMORE CRAIG, P.C.

By: _____
Thomas H. Fell
Anthony W. Austin
*Attorneys for Plaintiffs.*

19

10805167.1/037967.0002